FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

APR 29 2010

Stephan Harris, Clerk
Cheyenne

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

|  |  |
|---|---|
| JAMES E. LARGE, et al., | |
| Plaintiffs, | |
| vs. | Case No. 05-CV-0270 |
| FREMONT COUNTY, WYOMING, et al., | |
| Defendants. | |

## MEMORANDUM OPINION STATING
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter is before the Court following a nine-day bench trial. At trial, the Plaintiffs, five members of the Eastern Shoshone and Northern Arapaho Tribes, were represented by Laughlin McDonald and Bryan Sells from the American Civil Liberties Union. The defendants, Fremont County, Wyoming, the Fremont County Commissioners, and the Fremont County Court Clerk were represented by J. Scott Detamore of the Mountain States Legal Foundation and Richard Rideout. Having carefully considered the evidence presented and the arguments of counsel, the Court makes

the following findings of fact and conclusions of law.[1]

## Introduction

The Plaintiffs in this matter are enrolled members of the Eastern Shoshone Tribe and the Northern Arapaho Tribe. The defendants are Fremont County, the members of the County Commission, and the County Clerk, who are sued in their official capacities. The plaintiffs all reside on the Wind River Indian Reservation (sometimes referred to as "WRIR"), and are all residents of Fremont County, Wyoming. Fremont County is the second largest county in Wyoming. Within its borders lie the towns of Riverton and Lander, as well as several smaller settlements including Ethete, Hudson, Arapahoe, Fort Washakie, Jeffrey City, Shoshoni, and Dubois. The Fremont County Commission consists of five members elected from the county at-large, with no ward residency requirement. Elections are partisan, and terms of office are staggered and for four years, with two members elected in presidential election years and three members elected in off-years. Election is by plurality vote.

The plaintiffs challenge the elections for the County Commission on the basis that the elections dilute Indian voting strength in violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973(b), and the Fourteenth and Fifteenth Amendments of the United States Constitution.

---

[1] While it is always a struggle to find a unanimously-preferred nomenclature, for the sake of consistency, throughout this Order the Court will use the terms "Indian" or "Native" to refer to the minority involved in this suit. The Court will refer to the majority by using the terms "white" and "non-Indian."

2

Plaintiffs ask this Court to find that Fremont County's at-large method for electing county commissioners violates the Voting Rights Act, and therefore ask this Court to set aside the County's system. The defendants contend that Fremont County's at-large method for county commission elections does not violate the Voting Rights Act. The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

The Supreme Court has explained, in a broad sense, the underpinnings of a § 2 claim:

> The essence of a §2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [Indian] and white voters to elect their preferred representatives. [The Supreme Court] has long recognized that multimember districts and at-large voting schemes may 'operate to minimize or cancel out the voting strength of racial minorities in the voting population.' The theoretical basis for this type of impairment is that where minority and majority voters consistently prefer different candidates, the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters. Multi-member districts and at-large election schemes, however, are not *per se* violative of minority voters' rights.

*Thornburg v. Gingles*, 478 U.S. 30, 47-48 (1986) (internal citations omitted).

In *Sanchez v. Colorado*, 97 F.3d 1303, 1322 (10th Cir. 1996), the Tenth Circuit Court of Appeals summarized the role of the courts and the parties in Voting Rights Act cases. There the court explained:

> Plaintiffs are not required to rebut all the evidence of non-dilution to establish vote dilution. "Rather, the provision requires the court's overall judgment, based on the totality of circumstances and guided by those relevant factors in the particular case, of whether the voting strength of minority voters is, in the language of *Fortson v. Dorsey,* 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965), 'minimized or canceled out.' " 1982 U.S.C.C.A.N. at 207 n.118. "[T]he ultimate conclusions about equality or inequality of opportunity were intended by Congress to be judgments resting on comprehensive, not limited, canvassing of relevant facts." *De Grandy,* 512 U.S. at ----, 114 S.Ct. at 2657.

3

## Background

A look at current demographics in Fremont County is a useful exercise, as it not only establishes the general background of this case but it also provides the data that underlies a crucial component of plaintiffs' case. According to the 2000 census, Fremont County has a population of 35,804. The county seat is Lander. The most populous city is Riverton, with 9,310. Final Pretrial Order, p. 5; Pl. Ex. 234, p. 2 (Report of William Cooper). The county has a single-race Indian population of 7,047 (19.68%). Counting persons who self-identified as more than one race and some part Indian (or "any part"), there are 7,497 Indians (20.94 %). Final Pretrial Order, p. 5; Pl. Ex. 234, p. 2 (Report of William Cooper). Latinos, who may be of any race, comprise the next largest minority category in the county, representing 4.37% of the population. Of the 1,566 Latinos in Fremont County, 213 are "any part" Indian. Final Pretrial Order, p. 5; Pl. Ex. 234, p. 3 (Report of William Cooper). The minority population in Fremont County is 9,111 (25.45%), defined as all persons who are not single-race non-Hispanic white. Final Pretrial Order, p. 5; Pl. Ex. 234, p. 3 (Report of William Cooper). Over half (55.8%) of the county's Indian population is concentrated in the communities of Fort Washakie (1,379), Ethete (1,376), and Arapahoe (1,431). Final Pretrial Order, p. 5; Pl. Ex. 234, p. 3 (Report of William Cooper). There are 25,977 persons of voting age and 4,164 single-race Indians over 18 in Fremont County (16.03%). Including persons who are "any part" Indian, there are 4,419 Indians over 18 (17.01%). The minority voting age population is 5,464 (21.03%). Final Pretrial Order, p. 5; Pl. Ex. 234, p. 4 (Report of William Cooper). In the 2000 census, 2,075 persons in Fremont County self-identified as Shoshone. A larger group of 4,102

4

persons are placed in the "all other tribes" category by the census tabulation. There was no specified category choice for the Arapaho tribe. The third largest tribal identification is Sioux – selected by 229 persons. Final Pretrial Order, pp. 5-6; Pl. Ex. 234, p. 4 (Report of William Cooper).

The Indian population in Fremont County grew between 1980 and 2000, even as the overall population declined from 38,992 in 1980 to 35,804 in 2000. Final Pretrial Order, p. 6; Pl. Ex. 234, p. 4 (Report of William Cooper). Most of the county's population decline occurred during the 1980s and can be attributed to a decline in the non-Hispanic white population. Between 1980 and 1990, the non-Hispanic white population fell by 6,972 persons (-20.97%). By contrast, the Indian population grew in the 1980s, adding 1,836 persons over the decade – for a net gain of 41.68%. Final Pretrial Order, p. 6; Pl. Ex. 234, pp. 4-5 (Report of William Cooper). According to the 1980 census, 11.25% of the county's population was single-race Indian. By 1990, the single-race Indian population represented 18.48% of the population. In 1980, non-Hispanic whites comprised 85.26% of the county's population, but by 1990 the percentage had dropped to 78.05%. Final Pretrial Order, p. 6; Pl. Ex. 234, p. 5 (Report of William Cooper). Between 1990 and 2000, Fremont County reversed the sharp population loss of the 1980s and grew by 6.36%, or 2,142 persons. Final Pretrial Order, p. 6; Pl. Ex. 234, pp. 5-6 (Report of William Cooper). The Indian population continued to grow over the decade of the 1990s, but at a slower pace. Between 1990 and 2000, the single-race Indian population climbed by 825 persons (13.26%) to 7,047, representing 19.68% of the overall population at the time of the 2000 census. Final Pretrial Order, p. 6; Pl. Ex. 234, p. 6 (Report of William Cooper). Since 2000, Fremont County's overall population count has been relatively stable.

5

Census Bureau estimates for 2005 show a total population of 36,491, a 1.9 % increase since 2000. The Indian population continues growing. The Census Bureau estimates that the "any part" Indian population in the county reached 7,934 in 2005, representing 21.7% of the countywide population. Final Pretrial Order, p. 7; Pl. Ex. 234, p. 6 (Report of William Cooper). In short, the Indian population in Fremont County is a significant portion of the County's total population.

The historical and current experiences of Indians in Fremont County must also be addressed. The long history of discrimination against Indians in the United States, Wyoming, and Fremont County is undeniable. The evidence presented to this Court reveals that discrimination is ongoing, and that the effects of historical discrimination remain palpable. The Court rejects any attempt to characterize this discrimination as being politically, rather than racially, motivated. It is unnecessary at this point for the Court to draft a treatise on federal Indian policy or the historical experience of American Indians in the west. Suffice it to say that the record is replete with expressions of anti-Indian sentiment, both historical and current, and evidence of culturally-erosive policies such as allotment and compulsory boarding school enrollment. A more focused discussion of the effect of those practices and policies on the experience of members of the Shoshone and Arapaho Tribes is, however, necessary.

The history of discrimination against members of the Eastern Shoshone and Northern Arapaho Tribes goes back to the settlement of the frontier, a time period that is marked by a series of treaties which gradually decreased tribal land holdings. Skirmishes, often violent, between whites

6

and Indians during that time are well-documented.[2] The needs of the two groups were clearly at

odds–one driven by sovereignty, the other by manifest destiny, the two groups could not possibly

share territory without conflict, even in a land as vast as the west. This was evidenced then by

requests by the State Legislature to Congress to extinguish Indian title to the eastern portion of the

reservation for the purpose of establishing a route between Montana and Wyoming; it is evidenced

now by the ongoing dispute between the Tribe and the City of Riverton regarding jurisdiction over

the land that comprises the City. (Pl. Req. Jud. Not. 28 Council Resolution and Joint Memorial No.

15, Ch. 99, 1879 Wyo. Sess. 166).[3]

The cultures of the two groups were also often at odds. Treaties required Indian children to

attend school and to be given an English education. (Pl. Ex. 330 (Treaty with the Cheyenne and

Arapaho, Oct. 28, 1867), 15 Stat. 593, Art. 7); Pl. Ex. 331 (Treaty with the Sioux and Arapaho, Apr.

29, 1868, 15 Stat. 635, Art. 7); Pl. Ex. 332 (Treaty with the Northern Cheyenne and Northern

Arapaho, May 10, 1868, 15 Stat. 655, Art. 4); Pl. Ex. 333 (Treaty with the Eastern Band Shoshoni

and Bannock, July 3, 1868, 15 Stat. 673, Art. 7). In 1884, the Indian Department issued rules that

---

[2] The Court declines any invitation to identify the protagonist of each conflict; it is unnecessary to choose sides at this point. The skirmishes are only noted by way of remarking as to the deep roots of the tension between the groups.

[3] Plaintiffs' First Request for Judicial Notice, filed December 29, 2006, is found at Docket Entry 53; the order on same is found at Docket Entry 89, filed January 30, 2007. In that order the Court stated it would judicially notice all requested state and federal laws and judicial decisions. The remaining items could be offered into evidence, but would not be noticed.

7

the " 'sun dance,' the 'scalp-dance,' the 'war-dance,' and all other so-called feasts assimilating thereto, shall be considered 'Indian offenses,'" punishable by withholding of rations and imprisonment. The rules also provided that the "usual practices of so-called 'medicine men' shall be considered 'Indian offenses' cognizable by the Court of Indian Offenses" and punished by imprisonment. Pl. Ex. 340 (Indian Department Rule No. 497 (4th) and (6th) (1884)).

On several occasions the Wyoming Legislature acted on laws or resolutions that treated whites and Indians differently. State law made it a crime to sell Indians wine or liquor. Pl. Req. Jud. Not. 26 (Act of December 11, 1873, Ch. VII, 1873 Wyo. Sess. 1680); Pl. Req. Jud. Not. 52 (Act of 1897, 29 Stat. 506). In 1890 the legislature sent a resolution to Congress that "as the game has nearly all been killed, . . . the only use to which arms are put by these savages on their excursions is the killing of the cattle of the settlers and menacing them and their families," and requested Congressional legislation "as will result in the complete disarming of the Indians, and in keeping them on their reservations." Pl. Req. Jud. Not. 45 (Disarmament of the Indians, 1890 Wyo. Sess. 413). The ongoing hostility of white settlers to Indians was apparent in a 1890 memorial to Congress by the Wyoming legislature seeking reparations for "victims of Indian avarice, malevolence, robbery, murder and other crimes of the most hideous character committed by numerous bands of Indians inhabiting the country lying west of the Missouri River." Pl. Req. Jud. Not. 42. (Indian Depredation Claims, 1890 Wyo. Sess. 211). Another memorial from the Wyoming legislature requested Congress to adjudicate and pay claims of settlers and travelers who "sustained losses by reason of Indian outrages and deprivations committed without provocation." Pl. Req. Jud. Not. 46 (Claims

8

Arising from Indian Depredation, 1890 Wyo. Sess. 419).

As far as the federal government was concerned, the Indian residents of the country *were* different, as they were not citizens of the United States until 1924. Congress passed the Indian Citizenship Act in 1924, declaring Indians to be citizens of the United States. Pl. Req. Jud. Not. 70 (Pub. L. No. 175, 43 Stat. 253 (1924)). While citizenship presumably carried with it the right of franchise, literacy tests may have acted as a bar to an individual Indian's ability to exercise that right. Wyoming had, since it was enacted in 1890, a literacy test in addition to its citizenship requirement for voting. Pl. Req. Jud. Not. 44 (Wyo. Const., 1890 Wyo. Sess. 51). There is some evidence that this statute was seen by some reservation superintendents as an opportunity to impede the Indian vote. The Superintendent of the Crow Agency wrote to the Superintendent at Fort Washakie requesting a copy of the Wyoming law containing "an educational requirement for voters." "I am inclined to think," he said, "that this is a very good thing in this case, as there are certainly many Indians on your reservation and on my reservation who are utterly incapable of voting intelligently." Pl. Ex. 28 (C. H. Asbury, Supt. Crow Agency, to R. P. Haas, Supt. Ft. Washakie, June 9, 1924). The superintendent at Fort Washakie replied quoting sec. 9, art. 6, Wyoming Compiled Statutes (Annotated 1910), that: "No person shall have the right to vote who shall not be able to read the constitution of this state." Pl. Ex. 29 (R. P. Haas to C. H. Asbury, June 26, 1924.) As this statute was passed prior to the 1924 Indian Citizenship Act, the plaintiffs do not assert that the provision was adopted with an intent to prevent Indians from voting. The literacy requirement was reenacted again in 1943, and once again in 1951. (Pl. Req. Jud. Not. 85 (Act of Feb. 5, 1943, Ch. 27, 1943 Wyo.

Sess. 25. 88); Pl. Req. Jud. Not. 88 (Election Law Revision Act, ch. 127, 1951 Wyo. Sess. 197).
The literacy requirement remained in effect until 1971, after passage of amendments to the Voting
Rights Act in 1970 making the ban on literacy tests nationwide. Pl. Req. Jud. Not. 103 (Act of Feb.
27, 1971, ch. 178, 1971 Wyo. Sess. 236). One can only guess as to whether, or to what extent, the
literacy test acted as an impediment to the exercise of the Indian vote in Fremont County.

The conflict between the white settlers and the Indians was felt in Fremont County. The 1895
minutes of the Fremont County Commission noted "difficulties existing between the white settlers
and the Indians arising from conflict between the Shoshone Indians Treaty and the Wyoming state
laws governing hunting upon the unoccupied land," and directed the county attorney to confer with
the Indian Agent "for the adjustment of the matter." Pl. Ex. 1 (Minutes of Meeting, Fremont County
Commission, March 4, 1895). Two weeks later, the minutes reflected that white trappers in Fremont
County had fired upon some Indians, who then undertook to retaliate. The confrontation ended up
in court and was settled by an agreement that "in the future, no Indians should be permitted to leave
the said Indian Reservation and go upon the said upper Big Wind River lands unless accompanied
by one or more Indian Police." Pl. Ex. 2 (Minutes of Meeting, Fremont County Commission, March
28, 1895).

Policies intended to stifle culture continued into the twentieth century. Several witnesses at
trial testified to the effect of boarding schools on their families and their culture. Burton Hutchinson
attended boarding school at St. Michael's Mission in Ethete. He grew up speaking Arapaho, and did
not know how to speak English. He was sent to boarding school where students were punished for

10

speaking their native language. Hutchinson's braids were cut, and religion and bible classes were mandated. Burton Hutchinson Depo., at 11-18. Patricia Bergie's testimony demonstrated the pervasive effects of the boarding school experience. Bergie's parents were forced to speak English and were not permitted to speak their native language. Bergie testified that as a result, her parents chose to teach her to speak English instead of Shoshone "because of their experiences with washing out their mouth and being hit and stuff like that." She further testified that the result of her parents' experience was that they were "very distrustful of the white people," and that "it caused a lot of self-esteem problems, so just not being confident in that larger society." Tr. Trans. at 650-51.

At trial there was extensive testimony regarding racial tension and conflicts in the public schools. Burton Hutchinson testified about the effect that racial tension had on his public school education. He explained that he gave up after one year at the high school in Lander because of racial tension. "You weren't really recognized because you were Indian, you know. I noticed that. A lot of us gave up the first year. . . I felt that it wasn't no good." Burton Hutchinson Depo. at 23. Hutchinson's experience was in the 1940s. Patricia Bergie also testified that her experience at school was intimidating, and that the low expectations that the white teachers had for the students resulted in the students developing esteem problems. Tr. Trans. at 652-53. Gary Collins testified that he witnessed "innuendos and slurs and racial actions" aimed at native students. Tr. Trans. at 576.

Witnesses also testified to racial tension within the communities in Fremont County. Several witnesses testified to seeing signs on local businesses saying "No Dogs Or Indians Allowed." Emma Lucille McAdams testified that her family was once refused service at a café in Riverton. Tr. Trans.

11

at 996-997. While much of this testimony came from adults whose experiences occurred several decades ago, the Court also received evidence that racial tension is not a bygone. Michelle Hoffman is Superintendent of Fremont County School District No. 14, which includes Wyoming Indian High School. In her experiences traveling with Indian students in the non-Indian community, Hoffman has several times observed race-based conflicts, including taunting and racial slurs by both white students and adults. Tr. Trans. at 1085-1086. Sarah Wiles, Betty Friday, Keja Whiteman, Patricia Bergie, Ivan Posey, Michelle Hoffman, Helsha Acuna and Richard Brannan all testified to either personally experiencing or observing discrimination against Indians in businesses in towns in Fremont County, including Hudson, Lander, and Riverton. These experiences all occurred more recently, and some occurred within the last few years. The experiences included, *inter alia*, being ignored by sales people, being served only after whites had been served, being followed around in stores, being harassed by landlords, and receiving comments based on their race.

Some witnesses testified that they had not personally experienced nor observed any instances of racism in Fremont County. Ms. McAdams testified that in the last 20 years, she had not personally experienced any racism directed at her. Tr. Trans. at 1026. Gary Collins testified that he had not experienced any racial discrimination in the last twenty years in Fremont County. Tr. Trans. at 635.

Several witnesses also testified about observing discrimination in law enforcement and in the criminal justice system. Again, while some of these experiences date back to almost forty years ago, others are more recent. Valerie Thomas testified that during her work as public defender in Fremont County, she observed that bail is routinely denied to Indian defendants but granted to white

12

defendants. She also noticed that in reviewing files of white defendants it is usual to find consent

forms for the taking of blood samples or breathalyzer tests, but that it was not unusual for those

forms to be missing from the files of Native Americans. Tr. Trans. at 1249-1250. John Vincent, who

was elected mayor of Riverton in 2002, testified that he has gotten complaints of racial

discrimination in law enforcement by the Riverton Police. Based on the complaints, he requested the

FBI to conduct an investigation. Riverton has since adopted a new policy of "community policing,"

and Vincent testified that he has observed that the situation is improved. Tr. Trans. at 1746-1747.

Culture-based conflicts also persist. One such conflict is evidenced by the former exhibits

(and the effort to update them) in the Fremont County Pioneer Museum. Todd Guenther, former

director of the Fremont County Pioneer Museum, testified regarding the conflict caused by the

exhibits. Mr. Guenther was hired by the Fremont County Museums Board to oversee the operations

at the Museum, which included the duty of caring for and interpreting the collections. The Museums

Board is appointed by the County Commissioners. According to Mr. Guenther, in the early days a

number of Indians were members and officers in the Pioneer Association, whose mission centers

around historic preservation. Beginning in the 1940s, Native Americans stopped participating in the

Pioneer Association. Tr. Trans. at 1206-1207. Mr. Guenther testified that the reason for the decline

in participation was because Indians found the exhibits at the museum "to be very insulting and

didn't want to participate or visit that museum because of the ethnographic exhibits that had been

in place probably since the '50s." Tr. Trans. at 1207. Mr. Guenther applied for and received a grant

to update the exhibits, and the County Museum Board was very supportive, although the project was

13

met with some resistance. According to Mr. Guenther, when he announced the grant award at a meeting, Crosby Allen, who was an officer of the Board and later became a County Commissioner, asked him more about the project. When Guenther explained it to him, "he terminated the meeting by slamming his notebook shut and saying, 'I hate the goddamn Indians, and I won't have anything to do with this.'" Mr. Guenther explained that Mr. Allen's opposition became an impediment to progress at the museum: "When he became a member of the Fremont County Commission, he was considered by everyone involved with the museum that I spoke with as being very hostile to our efforts to get the museum building either repaired or replaced and became a major obstacle to our making progress in the first few years of that undertaking." Tr. Trans. at 1210. Opposition has been expressed by others in the community. Mr. Guenther testified that after he makes a public presentation, such as a slideshow or lecture, oftentimes people will come up afterwards to comment or ask questions. Mr. Guenther stated that "I have had people come up to me and say, well, I'll support that museum if you don't spend much time, you know, if you don't emphasize those prairie niggers." Tr. Trans. at 1219. Mr. Guenther explained that that term "is a slur that's heard around the area referring to Native Americans." Tr. Trans. at 1219. It is notable that these events occurred within the past ten years. Further evidence of a continuing cultural divide between the people of Fremont County is found in Lander's annual "One-Shot Antelope Hunt," which is seen by some as derogatory in its portrayal of Indian women, discussed by numerous witnesses during the trial.

The Court finds that these instances of racial discrimination cannot be dismissed as a few bad experiences caused by a few "bad apples." Rather the testimony evidenced a more extensive

14

problem, that while of course is not reflective of the attitudes and behaviors of all citizens of

Fremont County, is nevertheless relevant in the Court's inquiry.

## **Legal Framework**

At issue here is whether Fremont County's at-large method of voting for the county

commission violates § 2 of the Voting Rights Act. "The essence of a § 2 claim is that a certain

electoral law, practice, or structure interacts with social and historical conditions to cause an

inequality in the opportunities enjoyed by black and white voters to elect their preferred

representatives." *Gingles* at 47. Section 2, codified at 42 U.S.C. § 1973, provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or
procedure shall be imposed or applied by any State or political subdivision in a
manner which results in a denial or abridgement of the right of any citizen of the
United States to vote on account of race or color, or in contravention of the
guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b)
of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality
of circumstances, it is shown that the political processes leading to nomination or
election in the State or political subdivision are not equally open to participation by
members of a class of citizens protected by subsection (a) of this section in that its
members have less opportunity than other members of the electorate to participate
in the political process and to elect representatives of their choice. The extent to
which members of a protected class have been elected to office in the State or
political subdivision is one circumstance which may be considered: Provided, That
nothing in this section establishes a right to have members of a protected class
elected in numbers equal to their proportion in the population.

The Supreme Court's decision in *Thornburg v. Gingles*, 478 U.S. 30 (1986) provides the

framework within which this Court must conduct its analysis of the plaintiffs' claim. In order to

15

establish a vote dilution claim, a plaintiff must establish three preconditions which were set forth by

the *Gingles* Court. The presence of those three factors "creates the inference the challenged practice

is discriminatory," *Sanchez v. State of Colo.*, 97 F.3d 1303, 1310 (10th Cir. 1996), and while "these

three conditions are necessary to establish a vote dilution claim, they are not sufficient." *Id.* (citing

*Johnson v. DeGrandy*, 512 U.S. 997, ____ (1994)). The factors are as follows:

> First, minority plaintiffs must prove their group is 'sufficiently large and geographically compact to constitute a majority in a single-member district.' Second, plaintiffs must show the minority group is "politically cohesive.' Third, they must demonstrate 'the white majority votes sufficiently as a bloc to enable it-in the absence of special circumstances, such as the minority candidate running unopposed-usually to defeat the minority's preferred candidate.

*Sanchez*, 97 F.3d at 1310 (quoting *Gingles*, 478 U.S. at 50-51).

In addition to the three so-called "*Gingles* preconditions," a court "must assess the impact

of the contested election practice on minority electoral opportunities by assessing certain objective

factors." *Sanchez v. Bond*, 875 F.2d 1488, 1491 (10th Cir. 1989). Those factors are the factors set

forth in the Senate Report which accompanied the amendment which was made to § 2 in 1982. The

factors include:

> 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
>
> 2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
>
> 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

16

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political *1492 subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Id.* (citing  S.Rep. No. 417, 97th Cong., 2d Sess. 28-29, reprinted in 1982 U.S.Code Cong. & Ad. News 177, 206-07.)

There has been no shortage of discussion and decision on the level of proof required to succeed on a § 2 claim. After the Supreme Court interpreted § 2 to require proof that the challenged electoral practice had been intentionally adopted or maintained by a jurisdiction for a discriminatory purpose, Congress amended § 2 to incorporate the "results test." *See* 82 U.S.C.C.A.N. 205. This means that the court is to "assess the impact of the challenged structure or practice on the basis of objective factors, rather than making a determination about the motivations which lay behind its adoption or maintenance." *Id.* "[T]he specific intent of this amendment is that the plaintiffs may

17

choose to establish discriminatory results without proving any kind of discriminatory purpose." *Id.* at 205-206. In short, "Section 2 protects the right of minority voters to be free from election practices, procedures or methods, that deny them the same opportunity to participate in the political process as other citizens enjoy. If as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice, there is a violation of this section." *Id.* at 206.

By virtue of the amendment, the Supreme Court decision in *White v. Regester*, 412 U.S. 755 (1973) enjoyed a resurrection of sorts. It is that decision, in addition to the *Gingles* decision, that will act as this Court's compass in its determination of whether Fremont County's at-large electoral system for the County Commission violates § 2. It cannot be overemphasized that plaintiffs are not required to prove (and indeed, here do not allege), that the at-large voting system at issue was adopted with an intent to discriminate. By removing this requirement when it amended § 2, Congress undoubtedly preserved the peace by allowing plaintiffs in this country to bring this kind of claim without having to lob accusations at past officials who may have supported the challenged voting mechanism. That said, the Court recognizes that this type of case inevitably involves the airing of dirty laundry, some amount of finger pointing, repeating of racial slurs, and a meticulous examination of a record that chronicles a shameful chapter in American history that resonates and in this case, a view into present-day race relations in

18

### First *Gingles* Factor: Size and Geographical Compactness of the Minority Group

The plaintiffs must prove that their group is "sufficiently large and geographically compact

to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50 n. 17. The Tenth Circuit

Court of Appeals addressed this factor in its decision in *Sanchez*, 97 F.3d at 1311. There, the Court

explained:

> The first question, whether the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district," simply asks whether any remedy is possible in the first instance. As *Gingles* noted:
>
>> The reason that a minority group making such a challenge must show, as a threshold matter, that it is sufficiently large and geographically compact to constitute a majority in a single-member district is this: Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice.
>>
>> 478 U.S. at 50 n 17, 106 S.Ct. at 2766 n. 17 (emphasis in original). As a corollary, if the minority group is small and dispersed, no single member district could be created to remedy its grievance.
>
> Hence, the first prerequisite asks about 'the existence of a legally cognizable injury.' As such, this element of proof assists a court in finding 'a reasonable alternative practice as a benchmark against which to measure the existing voting practice.' 'The inquiries into remedy and liability, therefore, cannot be separated: A district court must determine as part of the Gingles threshold inquiry whether it can fashion a permissible remedy in the particular context of the challenged system.'

*Sanchez*, 97 F.3d at 1311 (internal citations omitted) (emphasis in original).

It is clear that the population is sufficiently large. As already noted, according to the 2000

census, the population of Fremont County is 35,804. Pl. Ex. 234, p.2. The county has a single-race

Indian population of 7,047, which equals 19.68% of the population. Including persons who identified

19

themselves as "any part" Indian, there are 7,497 Indians, which equals 20.94% of Fremont County's population. There are 25,977 persons of voting age and 4,164 single-race Indians over 18 in Fremont County (16.03%). Including persons who are "any part" Indian, there are 4,419 Indians over 18 (17.01%). The minority voting age population is 5,464 (21.03%). The population is also sufficiently compact. The Reservation covers 3,525 square miles. Approximately 90% of the reservation is in Fremont County, with the remainder extending into Hot Springs County. Tr. Trans. at 22. Fremont County itself covers approximately 9,250 square miles. Tr. Trans. at 22. The vast majority of the Indian population in Fremont County resides on the Reservation. Tr. Trans. at 18. Over half (55.8%) of the county's Indian population is concentrated in the communities of Fort Washakie (1,379), Ethete (1, 376), and Arapahoe (1, 431). Tr. Trans. at 18.

The parties did not quibble much over this factor. The Court heard testimony from and reviewed the reports of plaintiffs' expert William Cooper. Mr. Cooper drew two illustrative plans containing five single member districts, one of which was majority Indian. Pl. Ex. 234. The plans were drawn using, to the extent possible, borders of existing precinct boundary lines, and Mr. Cooper testified that they complied with traditional redistricting criteria. Mr. Cooper presented two plans, each containing the same majority Indian district. In drawing his plans, Cooper treated all Indians as a single demographic group.[4] Tr. Trans. at 19. The average population for a proposed county

---

[4] He did so because in other cases in which he has served as an expert, he included members of different tribes in the same district. In a case in Montana, not only where different tribes included in a single state senate district, but the tribes lived on two different reservations which were separated by mountains. That district, which is majority Indian, is currently in effect in Montana. Tr. Trans. at 19-20.

20

commission district is about 7,160.  Tr. Trans. at 24 (William Cooper).

The majority Indian district, District 1, is the same in both plans.  The district is almost entirely within the boundaries of the Wind River Reservation, with the exception of an unpopulated area in the northwest.  The district encompasses 1,530 square miles – about 17% of the overall land area of the county.  All six of the communities with significant Indian populations are located in District 1.  Over three-fourths of Fremont County's Native American population lives in the district. District 1 has a population of 7,147 and is within 14 persons of the ideal district size of 7,161 for a five-district plan.  The district population is 75.14% single-race Indian and 70.34% single-race Indian voting age.  The voting age population in the district is 71.37% "any part" Indian.  Pl. Ex. 234, Exs. 3a & 4a; Tr. Trans. at 23-24 (William Cooper).

Districts 2 and 3 are the same under both plans.  Riverton is split between Districts 3 and 4 in an identical fashion under both plans.  Pl. Ex. 234, Exs. 3d & 4d.  Riverton must be divided because it has a population of 9,300 – well above the ideal district population size.  The key difference between the two illustrative plans is that Plan A splits Lander into Districts 4 and 5, while Plan B places Lander entirely within District 5.  Pl. Ex. 234, Exs. 3e & 4e.

The Court finds that the American Indian population in Fremont County is sufficiently compact and numerous to allow for the drawing of a single-member Indian majority voting district, and therefore that the plaintiffs have satisfied the first *Gingles* factor.

21

## Second *Gingles* Factor: Political Cohesiveness of the Minority Group

This factor requires a plaintiff minority group to show that it is politically cohesive, because

"if the minority group is not politically cohesive, it cannot be said that the selection of a

multimember electoral structure thwarts distinctive minority group interests." *Gingles*, 478 U.S. at

51. The Tenth Circuit Court of Appeals has discussed this factor in both of its *Sanchez* decisions.

In *Sanchez v. State of Colorado*, the court defined the inquiry established by *Gingles*:

> The inquiry is essentially whether the minority group has expressed clear political preferences that are distinct from those of the majority.' Thus, we judge political cohesiveness by looking at the 'voting preferences expressed in actual elections.' Necessarily, when we examine the evidence of political cohesiveness as voting preferences, we look to the same statistical evidence plaintiffs must offer to establish vote polarization. Indeed, political cohesiveness is implicit in racially polarized voting.

*Sanchez*, 97 F.3d at 1312 (citing *Gomez v. City of Watsonville*, 863 F.2d 1407, 1415 (9th Cir. 1988)).

The Tenth Circuit has also instructed that the inquiry at this stage is limited in that a court

should not consider the reasons underlying a vote.

> It is clear from *Gingles* that a showing that a significant number of minority group members usually vote for the same candidates can establish the requisite political cohesiveness under § 2. Furthermore, we agree with appellants that a court may not explain away evidence of racial bloc voting by finding that such voting is caused by underlying differences between the minority and white population. The reasons why minority voters may vote alike is unimportant in determining whether in fact the minority group votes as a bloc. Racially polarized voting, which indicates political cohesion, exists when there is a consistent relationship between the race of the voter and the way in which the voter votes or, in other words, where minority voters and white voters vote differently.

*Sanchez v. Bond*, 875 F.2d at 1493 (citing *Gingles,* 478 U.S. at 53, 56).

In this case, the parties agree that American Indians in Fremont County tend to vote

cohesively. Defendants' Proposed Findings and Conclusions at 131; Plaintiffs' Proposed Findings and Conclusions at 77. This is based on the fact that the experts for both sides agreed that the minority group here usually votes cohesively. Specifically, statistical evidence offered by both parties demonstrates that Native Americans in Fremont County are politically cohesive. Pl. Exs. 239, 240 (Reports of Steven P. Cole); Def. Exs. B-M (Reports of Ronald E. Weber). In conducting their analyses, plaintiffs' statistical expert, Dr. Steven P. Cole, and the defendants' expert, Dr. Ronald E. Weber, used bivariate ecological regression analysis (BERA) and homogeneous precinct analysis (HPA), both of which have been sanctioned by the Supreme Court in *Thornburg v. Gingles*, 478 U.S. at 52-53. Pl. Ex. 239; Def. Ex. B; Tr. Trans. at 108 (Steven P. Cole), 361-66 (Ronald E. Weber).

The two experts also used the more recent ecological inference (EI) method developed by Dr. Gary King. Pl. Ex. 239; Def. Ex. B; Tr. Trans. at 108 (Steven P. Cole), 361-66 (Ronald E. Weber). Dr. Cole relied primarily on his BERA estimates, Tr. Trans. at 116 (Steven P. Cole), and Dr. Weber relied primarily on his EI estimates, Tr. Trans. at 361-66 (Ronald E. Weber), but statistics produced by all three methods tell the same basic story in this case. Indeed, both parties concede that the Court need not choose between statistical methods because the results of each are so similar. Tr. Trans. at 120, 153 (Steven P. Cole), 366 (Ronald E. Weber), 460 (J. Scott Detamore).

In conducting their analysis, both experts used precinct population data prepared and provided them by Mr. Cooper. Pl. Exs. 235 (Report of William Cooper), 239 (Report of Steven P. Cole); Def. Ex. B (Report of Ronald E. Weber); Tr. Trans. at 30-1 (William Cooper), 107 (Steven P. Cole), 330 (Ronald E. Weber) ("I'm using exactly the same precinct voting age population data

that Dr. Cole used in his analysis"). Mr. Cooper determined precinct population using precinct maps provided by the County and overlaying them on 1990 and 2000 census block maps. Pl. Ex. 235 ; Tr. Trans. at 32 (William Cooper). The experts also relied on official precinct level election returns provided by Fremont County. Pl. Ex. 239 (Report of Steven P. Cole); Def. Ex. B (Report of Ronald E. Weber); Tr. Trans. at 107 (Steven P. Cole), 330-31 (Ronald E. Weber). There is no dispute over the data used by the experts in this case.

Both experts analyzed each general election for the County Commission between 1986, when the county first adopted the current five member election system, and 2006. Pl. Exs. 239, 240 (Reports of Steven P. Cole); Def. Exs. B-M (Reports of Ronald E. Weber); Tr. Trans. at 122-23 (Steven P. Cole). Because these are the elections "on which plaintiffs premise their vote dilution claim," *Sanchez v. Colorado*, 97 F.3d at 1317, the Court finds that they are the "endogenous" elections in this case. Both experts also analyzed all of the contested Democratic primary elections for each endogenous County Commission contest. Pl. Exs. 239, 240 (Reports of Steven P. Cole); Def. Exs. B-M (Reports of Ronald E. Weber); Tr. Trans. at 122 (Steven P. Cole).

Both experts also analyzed a number of "exogenous" elections involving some part of Fremont County. Pl. Exs. 239, 240 (Reports of Steven P. Cole); Def. Exs. B-M (Reports of Ronald E. Weber); Tr. Trans. at 122-23 (Steven P. Cole), 326-27 (Ronald E. Weber). Dr. Cole analyzed 11 exogenous general elections between 1986 and 2006: the 2006 general election in Senate District 25; the 2006, 2004, 1998 and 1992 general elections in House District 33; the 1996 and 1994 general elections in House District 34; the 1990, 1988 and 1986 general elections for the state house from

24

Fremont County at large; and the 1986 "special" general election for a two year term on the Fremont County Commission. Pl. Exs. 239, 240 (Reports of Steven P. Cole); Tr. Trans. at 122-24 (Steven P. Cole). Dr. Cole also analyzed four exogenous primary elections: the 2004 and 2002 Democratic primaries in House District 33; the 1992 Democratic primary in House District 34; and the 1986 Democratic primary election for a two year term on the Fremont County Commission. Pl. Exs. 239, 240 (Reports of Steven P. Cole); Tr. Trans. at 122-24 (Steven P. Cole).

Dr. Weber analyzed all of those primary and general elections plus six others between 1982 and 1984: the 1984 and 1982 general elections for the state house from Fremont County at-large; the 1982 Democratic primary election for the state house from Fremont County at-large; the 1984 and 1982 general elections for County Commission under Fremont County's former election system; and the 1982 Democratic primary election for County Commission under Fremont County's former election system. Def. Exs. B-M (Reports of Ronald E. Weber); Tr. Trans. at 326-27 (Ronald E. Weber).

While they differed somewhat on how they defined cohesion, both experts concluded that Native Americans in Fremont County are politically cohesive. Tr. Trans. at 133 (Steven P. Cole). According to defendants' expert Dr. Weber, "I've found cohesion on the part of the Native American group, which is the second prong of *Gingles,* in the County Commissioner elections and in the exogenous elections as well." Tr. Trans. at 434 (Ronald E. Weber). See also Tr. Trans. at 378 (Ronald Weber) ("the usual pattern in the general election is cohesive behavior by the Native American voter"). Dr. Weber also found that Indian voters were usually cohesive in the Democratic

25

primary election. Tr. Trans. at 378-379.

Specifically, in County Commission elections from 1982 to 2006, Dr. Weber found four instances of strong cohesion and fourteen instances of moderate cohesion, for a total of eighteen cohesive elections. Ex. B, Table 4 (Revised). According to his calculations, there was cohesion in eighteen out of 32 elections, which is a rate of 56.3%. Tr. Trans. at 378. Three of the four instances of strongly cohesive voting in County Commission elections were those three elections with Indian candidates. Dr. Weber found that Indian voters were 87% cohesive behind Candidate McAdams in 1996, 85% cohesive behind Candidate Ratliff in 2000, and 82% cohesive behind Whiteman in 2006. Ex. E, Ex. J. Dr. Cole testified that in operationalizing this second *Gingles* factor, endogenous elections are most probative, and that within endogenous elections, he relies most heavily on contests involving Indian candidates, because "it's in these kinds of contests that voters have a choice to vote for an Indian or not." Tr. Trans. at 132-33. Dr. Cole also found that Indian voters were strongly cohesive behind Indian candidates. Tr. Trans. at 135. For the County Commission elections, he found that 90% of Indian voters voted for McAdams, 85% for Ratliff, and 84% for Whiteman. Tr. Trans. at 135, Ex. 365. These combine to an unweighted average of 86%. When Dr. Cole assessed Indian cohesion for Indian candidates in exogenous general elections from 1986 to 2006, the unweighted average of cohesion that he found was 83%. Ex. 365 Tab. A2. He also found Indian cohesion for non-Indian Indian-preferred candidates at an average level of 64%. Ex. 365, Tab. A3.

In exogenous general elections, the parties' statistical analyses likewise show a pattern of strong support for Indian candidates. Pl. Exs. 239, 240 (Reports of Steven P. Cole); Def. Exs. B-M

26

(Reports of Ronald E. Weber). Dr. Cole found Indian cohesion for Indian candidates ranging from 64% to 99%, with an unweighted average cohesion of 83%. Pl. Ex. 365, Table A2, Pl. Ex. 239, Pl. Ex. 240, Table 6 (Reports of Steven P. Cole). In those same contests, Dr. Weber's analyses reveal Indian cohesion for Indian candidates ranging from 64% to 90%, with an unweighted average cohesion of 80%. Def. Exs. B-M (Reports of Ronald E. Weber). Including exogenous contests from 1984 and 1982, Dr. Weber's analyses reveal an unweighted Indian cohesion for Indian candidates of 79%. Def. Exs. B-M (Reports of Ronald E. Weber).

The plaintiffs have identified 19 non-Indian candidates who were Indian preferred candidates in endogenous general elections. Pl. Ex. 366, Summary Table B4. According to Dr. Cole's regression analyses, Indian cohesion for these candidates ranged from 51% to 85%, with an unweighted average cohesion of 64%. Pl. Exs. 239, 240 (Reports of Steven P. Cole). Dr. Weber's ecological inference analyses reveals Indian cohesion for those candidates ranging from 39% to 82%, with an unweighted average cohesion of 62%. Def. Exs. B-M (Reports of Ronald E. Weber).

The County argues that the American Indians in Fremont County are not a politically cohesive group, despite the fact that they tend to vote cohesively, because "for any group to be cohesive politically, it must possess political interests about which its members coalesce that are distinctive and unique compared to political interests of the majority. . . the question presented is whether the members of these two distinct nations are one political group, that is, whether they share the same issues, the priority of those issues, and the solution for those issues. If they do not, they are not one cohesive political group, despite that they may vote together. . . In this case, for Plaintiffs

27

to prevail requires that they demonstrate that all American Indians share distinct and unique substantive political interests in the Fremont County Commission that are thwarted by majority bloc voting." Defendants' Proposed Findings of Fact and Conclusions of Law at 132.

In *Gingles*, the Court explained that "[i]f the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests." 403 U.S. at 2766. This statement forms the basis for defendants' argument, which is that the minority group here must have distinct minority interests. The defendants also point to *Whitcomb v. Chavis*, which stated:

> The first requirement [is that] Negro residents of the Center Township Ghetto [] residents have interests in those areas of substantive law such as housing regulations, sanitation, welfare programs . . . garnishment statutes, and unemployment compensation, among others, which diverge significantly from the interests of nonresidents of the Ghetto.

403 U.S. 124, 135 n. 12, 91 S.Ct. 1858, 1864 n. 12 (1971) (quoting *Chavis v. Whitcomb*, 305 F. Supp. 1364, 1386 (D. Ind. 1969)).

The Tenth Circuit Court of Appeals has had occasion to find that a minority group was not cohesive. This was based on the district court's finding that the minority group was actually comprised of several politically distinct groups. In that case, *Sanchez v. Bond*, 875 F.2d 1488, 1493 (10th Cir. 1989), the Tenth Circuit Court of Appeals upheld the district court's finding that the minority group was not politically cohesive. The district court's finding was based on lay testimony that the minority group in question "consisted of several politically distinct groups which often support different candidates." *Id.* at 1493. One of the defendants, an Anglo county commissioner,

testified that he had received substantial Hispanic support during his election. *Id.* at 1491. The Court of Appeals found that it was permissible for a court to consider lay testimony in deciding whether a minority group is politically cohesive and that testimony of individuals involved in the political process is necessary "if the court is to identify the presence or absence of distinctive minority group interests." *Sanchez*, 875 F.2d at 1494. "The experiences and observations of individuals involved in the political process are clearly relevant to the question of whether the minority group is politically cohesive." *Id.*

Dr. Weber testified that in the five Democratic primaries for County Commissioner, he found evidence of more disagreement than agreement. Tr. Trans. at 423, and ultimately concluded that there was "some level of disagreement on the part of the two tribal groups" in the seven Democratic primaries that he analyzed. Tr. Trans. at 435. This finding, he testified, militates against a finding of political cohesion. He noted that the Eastern Shoshone are primarily in the Fort Washakie area, and the Northern Arapaho are primarily in the Ethete and Arapahoe area. Tr. Trans. at 421. He conducted a homogeneous precinct analysis, because there was a high percentage of Native Americans residing in those areas, to determine whether there is agreement or disagreement in the Democratic primary. Tr. Trans. at 421. Using the information contained in Table 14, it is apparent that in the 2006 Democratic primary for Fremont County, in the Fort Washakie precinct, Twitchell, a non-Indian, finished first, Whiteman finished second, and Goggles finished third. In Ethete, Goggles finished first, Whiteman finished second, and Twitchell finished third. In Arapahoe, Whiteman finished first, Goggles finished second, and Bebout finished third. His conclusion from

this is that after adding the "Arapaho" precincts together, the Arapahos preferred Goggles, while the Shoshone preferred Twitchell.

The plaintiffs extensively cross-examined Dr. Weber on this point. The Court finds it significant that Dr. Weber did not know the Shoshone composition of the Fort Washakie precinct, did not know the Arapaho composition of the Ethete precinct, did not know the Arapaho composition of the Arapahoe precinct, did not know how many Shoshone live in the Ethete and Arapahoe precincts, but presumed that there "probably are " some, did not know how many Arapaho lived in the Fort Washakie precinct, but presumed that there "probably are" some, and did not know how many Sho-Raps there are in any of those three precincts. Tr. Trans. at 477. This seriously undermines the weight of his conclusion that the two Tribes tend to disagree on candidates in the primaries, for if he was unsure of the percentages of tribal representation in each precinct, it is not clear how he reached a conclusion that the Tribes tend to support different candidates.

Further, Dr. Weber testified that 90 percent is the cutoff for using homogeneous precinct analysis. However, Dr. Weber testified that he did not know whether Fort Washakie, which is the most homogeneous of the three precincts, was above or below that 90 percent cutoff. (Tr. Trans. at 478). The Court finds the following testimony especially telling:

Q.     Well, you've got a, on the other end of the spectrum, a 74 percent Native American precinct in Arapahoe; correct?

A.     I think that's correct.

. . .

30

Q.     And of that you don't know what percentage is Shoshone and what percentage is

       Arapahoe, correct?

A.     That's correct.

Q.     And you didn't alert the Court that there might be some error introduced into the

       analysis by the large presence of not only non-Native Americans in that precinct but

       also Shoshone in that precinct; correct?

A.     Correct.

Q.     In fact, your entire analysis of these so-called tribal differences could be entirely

       skewed by either non-Native Americans who were voting in that primary or Native

       Americans of the other tribe who were voting in that primary, isn't that right?

A.     Those are alternative theories, yes.

Q.     And you have no way of disproving that alternative theory, do you?

A.     No.

Tr. Trans. at 479.

Dr. Weber's lack of knowledge of the percentage of Tribe representation in each precinct,

coupled with the application of an analysis which he admitted he does not normally apply below 90

percent, was further weakened when plaintiffs' counsel walked Dr. Weber through the last five

primary elections for the endogenous election. The end result was that he found agreement in three

out of the five primary elections for the County Commission, the endogenous election here, and that

his conclusion that there was more disagreement than agreement was based upon his inclusion of two

primaries for the State House, which is the exogenous election here. Tr. Trans. at 484. Further, he testified that for the two primary elections where he found disagreement, he thought the disagreement was "meaningful,"but could not say that it was "statistically meaningful," because it would be inappropriate to run a test of statistical significance under the circumstances. Tr. Trans. at 485. Further, Dr. Weber testified that he did not do any analysis of whether the differences between the two Arapaho precincts were greater or smaller than the differences between the Arapaho precincts and the Shoshone precinct. Tr. Trans. at 485-486. The Court finds that without any framework in which to weigh the actual meaning of these differences, the analysis is of little value, especially when coupled with the Court's questions regarding this whole line of analysis, as explained above. As such, the Court cannot find that Dr. Weber's findings regarding differences between the Tribe's voting preferences can undermine a finding of cohesion, which both experts agreed was present.

The defendants' argument is that "by definition, the two Tribes on the Reservation are distinct political groups." In support of this argument, the defendant first points to the fact that the two Tribes are culturally distinct, as evidenced by their different languages, different historical territories, and different historical alliances. The defendant also notes that the two Tribes traditionally were enemies, and that the two Tribes do not voluntarily share the Reservation. In addition, the defendant points out that the Tribes have not chosen to form a single government, unlike other Tribes who have been placed together on reservations.[5] As a result, the Tribes maintain

---

[5] The Tribes do, however, have a Joint Business Council.

some separate governmental functions, such as health, human services, housing, transportation, economic development, utilities, and domestic water supply. In addition, the Arapaho outnumber the Shoshone by approximately three to one.

Several witnesses at trial testified about the relationship between the two Tribes. Representative Goggles testified that the Tribes differ in their needs and the way to meet those needs. For example, a Tribal Liaison was created as part of the Governor's office to facilitate communication among the governor, legislature, and Tribes; Ivan Posey, currently the Chairman of the Eastern Shoshone Tribe, was appointed to that position. Subsequently, two Tribal Liaisons were appointed, one from each Tribe, because neither Tribe would accept a Liaison from the other Tribe:

Q:      Do you have any opinion as to why two tribal liaisons as opposed to one was necessary?

A:      Two separate nations.

Q:      Do you think they have different views, different needs, et cetera?

A:      Absolutely.

Q:      To put before the legislature?

A:      Sure.

Representative Goggles believes that the Tribes have fundamental differences in terms of their economic agenda and needs, comparing the Arapaho focus on Social Services with the Shoshone focus on economic development:

Q:      Could you describe . . . the differences in what the two tribes seek [from the

33

legislature]?

A:      [An] obvious difference . . . is population.   . . .   The Arapahos, in terms of populations, are about a 3 to 1 ratio. . . . That population difference has a huge impact on the funding for programs.  So obviously you would see . . . a more acute need with the Arapaho than with the Shoshone.

Q:      Are you saying that the needs for various Social Services of the Arapaho are greater than that for the Shoshone?

A:      In most respects, yes.

Q:      Do you see any other differences between the tribes insofar as they related to the legislature?

A:      Sure.  I do.

Q:      Could you tell me what those might be?

A:      The Shoshone have a different economic agenda than the Arapaho, and that's largely based on population.  . . .  The Arapaho have a huge unmet need in Social Services, in housing, in employment.  The Eastern Shoshone . . . have established an economic agenda. They went into the health care area.  [They] established a manor.  [They] have established a dialysis center.   They've also ventured into technological area. . . .   They have a construction enterprise.  They have an office furniture enterprise.  They have a convenience store enterprise.  So they do have a separate but distinct economic agenda for their tribe.

Q:      As a result, would you say that the Shoshone tend to be more conservative than the

34

Arapaho?

A:      In some respects, yes, I would say that.

Indeed, Chairman Posey also testified to this point:

Q:      And would you agree that the two Tribes have a lot of issues are . . . not in common?

A:      Yes.

Q:      And would you agree with the proposition that each Business Council is elected to

bring forth the vision each Tribe has for itself, and that those visions don't always match?

A:      Yes.

Plaintiff Patricia Bergie was of the same opinion:

Q:      Do you think [the Tribes] agree on the prioritizations of solving problems or

addressing them?

A:      I would say they probably don't.

Q:      Why not?

A:      I think each Tribe has their own priority, and those priorities are usually different.

Q:      Do you have any idea whether they agree on solutions to . . . problems?

A:      I don't know that they get that far to talk about solutions.

Chairman Brannan of the Arapaho Tribe agreed:

Q:      Do you believe that the two Tribes share the same priority and agree on solutions?

A:      No, because the Arapaho Tribe has double the population of the Shoshone, so

circumstances dictate where our priorities are.

These disagreements and differences in perspective are mirrored by the inability of the Joint Business Council to meet to discuss issues of importance. In fact, Chairman Posey believes that this inability to meet and deal with issues is so severe as to threaten the two Tribes' sovereignty:

Q:     And would you agree with the proposition that the inability to meet and do business on a regular basis has affected the needs of [tribal] members and has created a serious threat to . . . sovereignty?

A:     Yes.

Plaintiff Emma McAdams even testified that "the Council's joint problems are not [solved]" because they're not geared to getting there on time and taking care of business." "They each take care of their own business individually, but when it comes to joint matters, it seems like they don't get together and take care of that."

In response, the plaintiffs offered evidence that tends to support a finding that the tribes are not only *politically* cohesive, but are a cohesive group. Indian political cohesion is evident from other factors, including that Indian traditions and culture are maintained on the reservation. The tribes have a shared interest in cultural preservation that unify them and distinguish them from the rest of the County's residents. Defendant Whiteman believes Indians on the reservation have special needs and concerns that are in some very important ways different from those of the non-Indian community.    Tr. Trans. at Trans. at 1540 (Keja Whiteman).   Among those special needs and concerns would be the preservation of Indian culture and language. *Id.* at 1540-41.

According to Dr. Massey, "the Indian traditions and cultures are a major reason that people

36

live on the reservation." Tr. Trans. at Trans. at 60 (Garth Massey). There has been a program for more than two decades to revive the Arapaho and Shoshone languages, and children are instructed in those languages in elementary school. *Id.* Patricia Bergie is making an effort to learn Shoshone because "it's who I am," she said. The tribes are also making an effort to teach native languages to Indian children. Tr. Trans. at 651-52 (Patricia Bergie). The Shoshone have established a Culture Center to preserve and perpetuate the culture of the Eastern Shoshone Tribe. Tr. Trans. at 666 (Patricia Bergie).

Indian traditions and culture remain important. According to Richard Brannan, "[w]e have . . . our songs, our medicines, our lodges, our ceremonies." Tr. Trans. at 876 (Richard Brannan). James Large has been heavily involved in efforts to maintain and promote Indian culture and traditions. He was active, he said, "in promoting the Indian way of life and the Indian thought process and the Indian religion and the Indian language." Tr. Trans. at 1045 (James Large). Sarah Wiles said "there has been a tremendous effort on the reservation" to maintain Indian language and cultural traditions. Tr. Trans. at 1123 (Sarah Wiles). Since 1987, "there have been events on the reservation called . . . language and culture camps. And at these camps a variety of different traditional activities are taught in addition to language, music, crafts, dancing, traditions, stories, things like that." Tr. Trans. at 1124 (Sarah Wiles). Recent photographs taken by Wiles show traditional Arapaho ceremonies on the Wind River Indian Reservation, including a giveaway, powwows, the grand entry at a powwow, powwow parade, women's traditional dance, dancing to the drum, men's traditional dance, a boy's team dance, hoop games, shinny game, and Heritage Day

at Wyoming Indian High School. Pl. Exs. 258-68; Tr. Trans. at 1146-50 (Sarah Wiles).

Indian cohesion is further evident from the fact that the Wind River Indian Reservation is owned undivided by both tribes, including all the mineral resources, the land, the water, oil and gas, timber, and the entire spectrum of natural resources. Tr. Trans. at 597 (Gary Collins); Tr. Trans. at 872 (Richard Brannan). The two tribes govern cooperatively through a Joint Business Council, and operate a joint court system. The tribes deal with the Bureau of Indian Affairs ("BIA"), lease land, and enter into oil and gas agreements jointly. The tribal Head Start is a joint program. Tr. Trans. at 872-73 (Richard Brannan). According to Ivan Posey, the Joint Business Council has "significant authority" over the Wind River Indian Reservation. Tr. Trans. at 950 (Ivan Posey). The goals of both tribes, said Richard Brannan, are the same "in terms of economic activity on the reservation." Tr. Trans. at 899 (Richard Brannan).

Although the tribes historically were adversaries, that relationship has changed significantly over the years. The two tribes are now strongly connected by years of intermarriage. According to Representative Goggles, "when you say Arapaho and you say Shoshone, there's a group that's going to be larger than those two put together some day, and those are the children of the intermarried parents. . . . They call them Sho-Raps. Half Arapaho and Half Shoshone. And there's a large number of them and right now, they've really crossed traditional boundaries, cultural boundaries as well." Patrick Goggles, Depo. at 131 lines 9-17. "[W]hen we're focusing just on tribal membership, you know, we're missing the point." *Id.*, at 131 lines 24-25. James Large is a Sho-Rap. He is a member of the Northern Arapaho Tribe on his father's side, but his mother and brother are both enrolled

38

members of the Eastern Shoshone Tribe. He does not draw a sharp distinction between the Tribes. He says "it behooves me to be pro-Indian from both sides of the fence, so to speak." Tr. Trans. at 1038 (James Large). It is not unusual today for a family to have children who are members of different tribes. Tr. Trans. at 598-99 (Gary Collins). Richard Brannan has grandchildren who are Sho-Raps. Tr. Trans. at 872 (Richard Brannan). Burton Hutchinson's first wife was an Eastern Shoshone. His children, however, are Arapaho. Burton Hutchinson Dep., p. 10 lines 5-9. Hutchinson is also related to various Shoshone families. *Id.,* p. 34 lines 21-25.[6]

Richard Brannan foresees a day when, because of intermarriage and other factors, the two Tribes will merge into one tribal government. As he explained, "as you live close to each other as neighbors, your characteristics become much closer aligned to each other. We both have common goals, common interests, protecting the reservation, protecting our children. So there's commonalities that happen over time." Tr. Trans. at 873 (Richard Brannan). James Large also thinks that "maybe a hundred years from now there would be so much intermarriage that there will be no tribal distinction and it will be as one." Tr. Trans. at 1065 (James Large).

There is a great deal of social and business contact between members of the Shoshone and

---

[6] There is intermarriage not merely between the Arapaho and Shoshone but other tribes as well. Plaintiff Patricia Bergie, for example, was married to a tribal member from Montana who was Chippewa and Lakota. Tr. Trans. at 648 (Patricia Bergie). Ivan Posey, a member of the Eastern Shoshone Tribe, also has Arapaho blood through his father. His mother was an enrolled member of the Northern Cheyenne Tribe in Montana. Posey's wife was a member of the Northern Arapaho Tribe. Tr. Trans at 929 (Ivan Posey). In addition to Shoshone and Arapaho, residents on the WRIR self-identified as members of some 22 other tribes. Tr. Trans. at 51 (Garth Massey).

Arapaho Tribes. Tr. Trans. at 673 (Patricia Bergie). Patricia Bergie, who is a member of the Shoshone Tribe, is a deacon in an Arapaho Episcopal Church. Tr. Trans. at 689 (Patricia Bergie).

The experiences Indians have had with whites have been, and continue to be, similar. The tribes have a common history of discrimination. Many Indians have a common and related socio-economic status. As Dr. Massey put it, although Indians on the WRIR are members predominantly of the Shoshone and Arapaho Tribes, it would be "misleading to treat them as two very distinct groups. . . . [I]n almost all respects they are very, very similar in terms of employment, employment history, levels of poverty, and certainly the needs that they have." Tr. Trans. at 45 (Garth Massey).

Tom Throop testified Indians are cohesive and does not believe a majority Indian district for the County Commission would become divided along tribal lines because that has not happened in the majority house district that encompasses the WRIR. As he put it, "I believe strongly that there's a will and that they also have employed the means to bring consensus and make that kind of representation work at the legislative level and, if given the opportunity to do that at the County Commission level, that they would rise to the occasion and definitely make that position work." Tr. Trans. at 1197 (Tom Throop). James Large also said a Shoshone or Arapaho could get elected from a majority Indian district, and that "I think it depends on the personality of the individuality of the candidate." Tr. Trans. at 1068 (James Large). Goggles does not think a majority Indian district composed of the WRIR would be an Arapaho district, but that a Shoshone could win an election. Patrick Goggles, Dep, p. 130 lines 6-10. Other tribal members were of the same view. Ivan Posey said "it would come down to whoever is running for that office. . . . I think they would vote for an

American Indian." Tr. Trans. at 983 (Ivan Posey). Emma Lucille McAdams was also of the opinion

that a Shoshone or Arapaho elected from a majority Indian district would represent all tribal

members. "[T]hey're both from the same reservation," she said, "and they should know some of the

needs on the reservation." Tr. Trans. at 1012 (Emma Lucille McAdams).

The Court finds the defendants' argument unavailing, and finds that the Native Americans

in Fremont County are cohesive, regardless of the fact that the Native American population is

comprised primarily of two separate Tribes. It is particularly telling that Indians in Fremont County

vote as a bloc in county elections regardless of their tribal affiliations. While the two Tribes may be

comprised of different language groups, and while they each have their own tribal council in addition

to a joint council, the Court finds that this does not undermine a finding of political cohesion. The

Court also finds that even if the two Tribes did tend to support different candidates in the primaries,

it is of little moment, because they obviously cohesively support candidates in the general election.

The defendants urge this Court that part of its analysis in this regard is to "identify the presence or

absence of distinctive minority group interests." A person need look no farther than the economic,

employment and housing statistics of the 2000 Census to see that this group has distinctive minority

interests *qua* minority group as compared to the non-minority residents of Fremont County. The

testimony of the history of tension between the two groups does little to undermine their shared

experience as a minority. The Court also finds that the testimony regarding the Tribes' differing

priorities *as separate Tribes* does not militate against a finding of political cohesion. The two Tribes

may pursue different projects and priorities while still collectively maintaining strong distinctive

minority group interests that can be telegraphed in unison through their representation on the County

Commission.

The Court finds that Native Americans in Fremont County are politically cohesive. They

have been strongly cohesive behind Indian candidates for the County Commission and the state

legislature. They have also been cohesive, but less so, behind non-Indian candidates of choice. In

light of this evidence, the Court finds that the plaintiffs have satisfied the second *Gingles* factor.

### Third *Gingles* Factor: Racial Bloc Voting

This factor was explained by the Tenth Circuit Court of Appeals in its *Sanchez* decision:

*Gingles* adopted a straightforward definition of racial bloc voting provided by the expert witness upon whom the district court had relied. Racial polarization or bloc voting 'exists where there is a consistent relationship between the race of the voter and the way in which the voter votes ... or to put it differently, where black voters and white voters vote differently.' The Court's focus was twofold: to determine whether the minority group votes cohesively and 'whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates.' The extent to which this bloc voting impairs the minority's ability to elect candidates of their choice, however, must be 'legally significant,' a sliding scale that varies with the district and a variety of factual circumstances and may emerge more distinctly over a period of time. While the Court offered no 'simple doctrinal test for the existence of legally significant racial bloc voting,' it urged a flexible approach, noting that the isolated success of a minority candidate in a district that usually exhibits vote polarization will not alone negate plaintiffs' showing. Thus, while legally significant white bloc voting enables the majority 'in the ordinary course, to trounce minority-preferred candidates most of the time,' its presence may be more subtle requiring close inquiry over time.

*Sanchez*, 97 F.3d at 1312-13 (internal citations omitted).

In *United States v. Alamosa County, Colorado*, 306 F. Supp. 2d 1016, 1029-1030 (D. Colo.

2004), the court explained how courts in the Tenth Circuit should approach this factor:

Legally significant "white bloc voting" occurs when the Anglo vote normally defeats the combined strength of cohesive minority support plus white crossover votes. *Gingles,* 478 U.S. at 56, 106 S.Ct. 2752. The focus is upon past election results-how voters voted, rather than why they voted the way they did. A court must determine what usually occurs in a jurisdiction, as distinguished from aberrational election results produced by special circumstances. *See id.* at 57 n. 26, 106 S.Ct. 2752; *Sanchez v. Colorado,* 97 F.3d at 1310.

In *Sanchez v. Colorado*, the Tenth Circuit endorsed the analytical approach taken by the Fourth Circuit in *Collins v. City of Norfolk, Va.*, 883 F.2d 1232, 1237 (4th Cir.1989). This inquiry begins by identifying the "preferred candidate" of the minority group. After identifying the candidate preferred by the minority group, a court examines whether Anglo voters have voted as a bloc (cohesively) against such candidate. If so, the remaining issue is whether such bloc voting resulted in the defeat of the minority group's preferred candidate. In applying the *Collins* test, the Tenth Circuit cautions that a court should not assume that a candidate was preferred by a minority group solely by virtue of the candidate's party or racial/ethnic status. It is the burden of the party seeking to establish a Section 2 violation to produce sufficient anecdotal or statistical evidence to establish the minority's preference in each election. *Sanchez v. Colorado,* 97 F.3d at 1319.

The experts for each side identified the preferred candidates, but their analyses, and therefore their conclusions, differed. The experts employed different methodologies for determining the Indian-preferred candidates. Cole explained that in a single-seat election, the candidate who received the majority of the support of the Indian voters would be an Indian-preferred candidate. In a multi-seat election, like the county commission elections at issue here, Cole applies rules from the Fourth Circuit, whereby in cases where there is a successful Indian-preferred candidate, any other candidates who received a majority of the minority vote would be an Indian-preferred candidate. In cases where the top vote getter of the minority was unsuccessful, any candidates who received at least two-thirds of the support of the top vote getter would be considered an Indian-preferred candidate. Tr. Trans.

43

at 141-42; Exhibit 239 at 13-15. Cole applied the Fourth Circuit rule in his report, but testified that the Tenth Circuit rule is more general, and that if he had applied the Tenth Circuit rule there would have been three extra Indian-preferred candidates.[7] Tr. Trans. at 142. Cole, unlike Weber, also included candidates who were Indian-preferred candidates in the Democratic primary but did not make it to the general election. Tr. Trans. at 143-44.

Weber utilized a different methodology to determine the Indian-preferred candidates. Weber uses the terms "candidate of choice" and "cohesively preferred," which have two different meanings. When he uses "candidate of choice," as he does in Table 3, he is referring to the candidates that would win if the election were held only among Native American voters. Tr. Trans. at 405. When Weber refers to Indian-preferred candidates, he counts only cohesively preferred candidates of choice, and therefore his definition is not interchangeable with the plaintiffs' definition of "Indian-preferred." His definition of "cohesive" is the same as that explained above–60 percent of the top two and 50 percent of the total. So when Weber was asked during cross-examination to identify the Indian-preferred candidates, he identified only those who were cohesively preferred, therefore coming up with a smaller number of Indian-preferred candidates than did Cole, and thus, a smaller number of polarized elections. Tr. Trans. at 504.

The experts agreed upon the following, and the Court finds the Indian-preferred candidates for County Commission in 2006 were Goggles, Whiteman and Twitchell. Pl. Exs. 240, Table 2 (Report of Steven P. Cole), 365 (Summary Table A4); Def. Exs. H-M (Reports of Ronald E.

---

[7] Those would have been Urbigkeit in 2000, Reno in 1996, and Large in 1986.

Weber); Tr. Trans. at 142-45 (Steven P. Cole), 505 (Ronald E. Weber). In 2004, the Indian-preferred candidate was Twitchell. Pl. Exs. 239, 240, Table 4 (Reports of Steven P. Cole), 365 (Summary Table A4); Def. Exs. B-M (Reports of Ronald E. Weber); Tr. Trans. at 142-45 (Steven P. Cole), 505 (Ronald E. Weber). In 2002, the Indian-preferred candidates were Shelsta, Rissler, and Blewer. Pl. Exs. 239, 240, Table 4 (Reports of Steven P. Cole), 365 (Summary Table A4); Def. Exs. B-M (Reports of Ronald E. Weber); Tr. Trans. at 132, 142-45 (Steven P. Cole), 505 (Ronald E. Weber). In 2000, the Indian-preferred candidates were Ratliff and Urbigkeit. Pl. Exs. 239, 240, Table 2 (Reports of Steven P. Cole), 365 (Summary Table A4); Def. Exs. B-M (Reports of Ronald E. Weber); Tr. Trans. at 142-45 (Steven P. Cole), 505 (Ronald E. Weber). In 1998, the Indian-preferred candidates were Reno, Lund, and Geher. Pl. Exs. 239, 240, Table 4 (Reports of Steven P. Cole), 365 (Summary Table A4); Def. Exs. B-M (Reports of Ronald E. Weber); Tr. Trans. at 142-45 (Steven P. Cole), 505-06 (Ronald E. Weber). In 1996, the Indian-preferred candidates were Reno and McAdams. Pl. Exs. 239, 240, Table 2 (Reports of Steven P. Cole), 365 (Summary Table A4); Def. Exs. B-M (Reports of Ronald E. Weber); Tr. Trans. at 142-45 (Steven P. Cole), 506 (Ronald E. Weber). In 1994, the Indian-preferred candidates were Nicol, Sollars, and Lund. Pl. Exs. 239, 240, Table 4 (Reports of Steven P. Cole), 365 (Summary Table A4); Def. Exs. B-M (Reports of Ronald E. Weber); Tr. Trans. at 142-45 (Steven P. Cole), 506 (Ronald E. Weber). In 1992, the Indian-preferred candidate was Phifer. Pl. Exs. 239, 240, Table 4 (Reports of Steven P. Cole), 365 (Summary Table A4); Def. Exs. B-M (Reports of Ronald E. Weber); Tr. Trans. at 142-45 (Steven P. Cole), 506 (Ronald E. Weber). In 1990, the Indian-preferred candidate was Spriggs. Pl. Exs. 239,

240, Table 4 (Reports of Steven P. Cole), 365 (Summary Table A4); Def. Exs. B-M (Reports of

Ronald E. Weber); Tr. Trans. at 142-45 (Steven P. Cole), 506 (Ronald E. Weber). In 1988, the

Indian-preferred candidates were Urbigkeit and Kenyon.  Pl. Exs. 239, 240, Table 4 (Reports of

Steven P. Cole), 365 (Summary Table A4); Def. Exs. B-M (Reports of Ronald E. Weber); Tr. Trans.

at 142-45 (Steven P. Cole), 506 (Ronald E. Weber). In 1986, the Indian-preferred candidates were

Large, Hudson and Reno.  Pl. Exs. 239, 240, Table s 2 & 4 (Reports of Dr. Steven P. Cole), 365

(Summary Table A4); Defs. Exs. B-M (Reports of Dr. Ronald E. Weber); Tr. Trans. at 142-45 (Dr.

Steven P. Cole), 507 (Dr. Ronald E. Weber).

According to Cole's definition of Indian-preferred candidates, in addition to the above

Indian-preferred candidates, the following would also be considered Indian-preferred in the County

Commission elections: Goggles in 2006, Shelsta and Rissler in 2002, Urbigkeit in 2000, Reno in

1996, Lund in 1994, Kenyon in 1988, Large and Reno in 1986. Pls. Exs. 240, Table 2, 365, Tr. 142-

145.

The next step is for the Court to determine whether the white majority ordinarily votes

sufficiently as a bloc to defeat the Indian-preferred candidates.  Here, again, the two experts rely on

two different methodologies to answer that question.  Cole suggested that two different methods are

appropriate to determine racially polarized voting.  One approach is "to look at who would get

elected if Indians were voting alone and who would get elected if whites were voting alone, and if

the different sets of candidates are different, that would be an index of racially polarized voting."

Cole, Tr. Trans. at 146.  The other method would be to look to white crossover voting.  According

to Cole, "racial polarization is exhibited whenever the set of candidates that would be chosen by voters of one race differs from the set of candidates that would be chosen by voters of the other race." (Pls. Ex. 239, Cole Report at 13.)

Weber explained his method as follows:

Q.     When do you find polarization or racial polarization in a multicandidate contest?

A.     Going in a multicandidate contest candidate by candidate, the minority preferred candidate would be matched up against a candidate that was preferred by the nonminority group. And basically the standard that I apply is that I expect that the cohesively preferred candidate of one group be juxtaposed or positioned against the cohesive behavior of the other group behind a different candidate of choice, and then it becomes a question of whether or not those differences are very clear. And I use the cohesion levels to define clearness for the two candidates. And then we ultimately get to the question of whether or not the candidate cohesively preferred by the minority group, the Native American group, is defeated by the voting of the other group.

Weber, Tr. Trans. at 388-89.

The Court finds that it is not necessary for the Court to choose between the methods utilized by the different experts, because both ultimately found that the white majority usually votes

47

sufficiently as a bloc to defeat the Indian-preferred candidates in the County Commission elections. Cole, Tr. Trans. at 145; Weber, Tr. Trans. at 509. Weber found, based on his calculations and definitions, that in the County Commission elections from 1982-2006, the Indian-preferred candidate was defeated eleven out of eighteen times. Tr. Trans. at 505-509. Based on 1988-2006 only, Weber found ten out of fifteen defeats. Def. Ex. B. Cole only considered the elections after 1985 when the current election format was implemented. Tr. Trans. at 150. The Court has elected to base its analysis of the instant issues on the elections that occurred after 1985 when the current election format was put into place. As the court in *Bone Shirt v. Hazeltine*, 461 F.3d 1011 (8th Cir. 2006), stated, "Endogenous and interracial elections are the best indicators of whether the white majority usually defeats the minority candidate. . . . The more recent an election, the higher its probative value." 461 F.3d at 1020-1021 (citing *Cottier v. City of Martin,* 445 F.3d 1113, 1121 (8th Cir. 2006) and *Uno v. City of Holyoke*, 72 F.3d 973, 990 (1st Cir. 1995)).

The Court agrees with Dr. Cole that 20 years of election data is more than sufficient to provide a comprehensive analysis of the issues now before the Court. Tr. Trans. at 150. Cole found that there were 24 Indian-preferred candidates. Out of these 24 Indian-preferred candidates, 19 were defeated, meaning that 79% of the Indian-preferred candidates were defeated in the endogenous contests. This number includes two Indian-preferred candidates who were defeated in the primaries and therefore did not make it to the general election. Cole counts those candidates as Indian-preferred candidates while Weber does not. (Cole, Tr. Trans. at 143-44; Weber, Tr. Trans. at 510).

In sum, in the majority of County Commission elections, the majority has defeated the

48

minority's preferred candidate. The experts' findings depended upon which elections were included in the calculations. In Dr. Cole's estimation, the minority-preferred candidates were defeated 79% of the time. According to Dr. Weber's calculations, the minority-preferred candidates were defeated 61% of the time when considering elections from 1982-2006, and 66% of the time when considering only elections from 1988-2006.

Weber's finding that the third *Gingles* factor was satisfied was based only on inclusion of the endogenous elections. In Weber's view, whether the third *Gingles* factor is met depends upon whether the analysis included exogenous elections. Tr. Trans. at 494. According to Weber, based only on County Commission elections, the endogenous elections, the plaintiffs satisfied the third *Gingles* factor. Tr. Trans. at 494. When he combined the County Commission elections and the six at-large State House elections, which are the exogenous elections, Weber found a pattern of nondefeat rather than defeat. Tr. Trans. at 494. In Weber's view, it is appropriate to consider both the County Commission elections and the State House of Representatives elections from 1982-1990, which were at-large elections, because they are similar electoral systems. Weber, Tr. Trans. at 428, 487.

Weber found that from 1982-1990, every time a candidate was cohesively preferred by the Indian community they were elected, meaning that there was a zero defeat rate in the at-large system formerly used for elections for the State House of Representatives. Tr. Trans. at 428. Weber's total tally then was ten defeats and fourteen wins for cohesive candidates of choice among Indian voters. Tr. Trans. at 429, 494. However, Weber also testified that there was a sufficient number of

49

endogenous elections upon which to reach a conclusion regarding the third *Gingles* factor. Tr. Trans. at 494.

If the Court and the experts have enough evidence based on the endogenous elections on which to base its conclusion regarding the third *Gingles* factor, it is unclear whether the Court should also consider the exogenous elections. The exogenous elections analyzed by Weber are similar in structure to the endogenous elections here, but Weber did note that the exogenous elections are different in that they allow more opportunity for single-shot voting.[8] Tr. Trans. at 486, 487, 494. He explained that staggered terms, like those in the Fremont County Commission elections, limit the opportunity of a minority group to engage in single-shot voting as compared to a pure multi-member district system where all five seats are up at the same time. Tr. Trans. at 486. The latter system is employed in the State House elections, and Dr. Weber explained that the value of single-shot voting was higher in those elections. Tr. Trans. at 487. The two systems therefore are slightly different and

_____

[8]In *Gingles*, at 478 U.S. at 39, n.5, 106 S.Ct. at 39, n. 5, the Court noted that "Bullet (single-shot) voting has been described as follows:

"'Consider [a] town of 600 whites and 400 blacks with an at-large election to choose four council members. Each voter is able to cast four votes. Suppose there are eight white candidates, with the votes of the whites split among them approximately equally, and one black candidate, with all the blacks voting for him and no one else. The result is that each white candidate receives about 300 votes and the black candidate receives 400 votes. The black has probably won a seat. This technique is called single-shot voting. Single-shot voting enables a minority group to win some at-large seats if it concentrates its vote behind a limited number of candidates and if the vote of the majority is divided among a number of candidates.'" *City of Rome v. United States*, 446 U.S. 156, 184, n. 19, 100 S.Ct. 1548, 1565, n. 19, 64 L.Ed.2d 119 (1980), *quoting* United States Commission on Civil Rights, The Voting Rights Act: Ten Years After, pp. 206-207 (1975).

less useful as a comparison. Because Weber agreed that there were enough endogenous elections on which this Court could base its conclusion regarding the third factor, the Court finds that it will consider endogenous elections only in determining whether racial bloc voting exists. The exogenous elections, however, are relevant in the totality of the circumstances analysis, and therefore the Court will consider them there. In conclusion, the Court finds that the white majority in Fremont County votes sufficiently as a bloc to enable it to usually defeat the minority-preferred candidate.

The analysis at this juncture is somewhat limited, as only certain evidence is relevant. The Court will engage in a more holistic consideration of the evidence during its totality of the circumstances analysis, during which more evidence becomes relevant. Guiding this Court is the trail of bread crumbs laid out by the Tenth Circuit Court of Appeals in its *Sanchez* decision, which instructs the Court as to the evidence relevant at each step of this process. "If the third *Gingles*' precondition asks whether whites vote sufficiently as a bloc to enable them usually to defeat the minority candidate, it is asking *how* voters vote, not *why* voters voted that way. Indeed, the searching evaluation done in the totality of circumstances perhaps reveals the answer to the latter question. However, at the threshold, we are simply looking for proof of the correlation between the race of the voter and the defeat of the minority's preferred candidate." *Sanchez* 97 F.3d at 1313. The court further explained that *Gingles* "instructs us to look for the theme of racial polarization and the extent to which that polarization robs the minority of meaningful access to the political process. While that may initially set a rather stark stage, 'establishing vote dilution does not require the plaintiffs affirmatively to disprove every other possible explanation for racially polarized voting.' *Uno*, 72

51

F.3d at 893. Requiring plaintiffs to rebut a showing that partisan politics and not racial bias operates

to defeat their § 2 claim may arise in another setting. However, it is not the story here." *Id.* at 1321.

## The Totality of the Circumstances

The Court finds and concludes that the plaintiffs have satisfied the three *Gingles*

preconditions and therefore have created an inference of a Section 2 violation. The next step is for

the Court to analyze the totality of the circumstances, focusing on the Senate factors. The Tenth

Circuit Court of Appeals explained this process in its decision in *Sanchez*, 97 F.3d at 1310-1311:

> The Senate Report accompanying the 1982 amendments elaborates the proof for a §
> 2 violation, specifying a "variety of relevant factors, depending upon the kind of rule,
> practice, or procedure called into question." S.Rep. No. 417, 97th Cong., 2d Sess.
> 28-29 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 206-07. [FN11 set out in note 9
> below in its entirety][9] The Senate Report added that "there is no requirement that any

[9][FN11.] The Senate Report states:

Typical factors include:

1. the extent of any history of official discrimination in the state or political
subdivision that touched the right of the members of the minority group to
register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is
racially polarized;

3. the extent to which the state or political subdivision has used unusually large
election districts, majority vote requirements, anti-single shot provisions, or other
voting practices or procedures that may enhance the opportunity for
discrimination against the minority group;

(continued...)

particular number of factors be proved, or that a majority of them point one way or the other." *Id.* at 207. Moreover, "[w]hile the enumerated factors will often be pertinent to certain types of § 2 violations, particularly to vote dilution claims, other factors may also be relevant and may be considered." *Gingles,* 478 U.S. at 45, 106

---

[9](...continued)

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

While these enumerated factors will often be the most relevant ones, in some cases other factors will be indicative of the alleged dilution.

The Senate Report states the factors are taken from the analytical framework expressed in *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), as articulated by a Fifth Circuit case, *Zimmer v. McKeithen,* 485 F.2d 1297 (1973) (en banc), *aff'd sub nom. East Carroll Parish School Bd. v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976).

S.Ct. at 2763 (citation omitted) (footnote omitted). Most importantly, "the question whether the political processes are 'equally open' depends upon a searching practical evaluation of the 'past and present reality,' and on a 'functional' view of the political process." *Id.* (quoting S.Rep. No. 417, 1982 U.S.C.C.A.N. 177, 208). The lack of electoral opportunity is the key. "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Id.* at 47, 106 S.Ct. at 2764.

## IV. *Gingles* and its Progeny

*Gingles* shorthands the totality of circumstances proof provided in the Senate Report recognizing "the conjunction" of three circumstances which, as preconditions, must be present to establish a vote dilution claim. Indeed, their presence creates the inference the challenged practice is discriminatory. First, minority plaintiffs must prove their group is "sufficiently large and geographically compact to constitute a majority in a single-member district." *Id.* at 50, 106 S.Ct. at 2766. Second, plaintiffs must show the minority group is "politically cohesive." *Id.* at 51, 106 S.Ct. at 2766. Third, they must demonstrate "the white majority votes sufficiently as a bloc to enable it -- in the absence of special circumstances, such as the minority candidate running unopposed -- usually to defeat the minority's preferred candidate." *Id.* While these three conditions are necessary to establish a vote dilution claim, they are not sufficient. *Johnson v. De Grandy,* 512 U.S. 997, ----, 114 S.Ct. 2647, 2657, 129 L.Ed.2d 775 (1994).

Under *De Grandy,* a court's examination of relevant circumstances is not complete "once the three factors were found to exist, or in the sense that the three in combination necessarily and in all circumstances demonstrated dilution." *Id.* This is so "because the ultimate conclusions about equality or inequality of opportunity were intended by Congress to be judgments resting on comprehensive, not limited, canvassing of relevant facts." *Id.* Failure to prove the totality of circumstances establishes the minority is not harmed by the challenged practice and rebuts the inference of discrimination arising from proof of the three preconditions. *Uno,* 72 F.3d at 980. In *Growe v. Emison,* 507 U.S. 25, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993), the Court expressly applied the Gingles' paradigm to a vote dilution claim against a single member district.

In *Gingles,* the Supreme Court, in a footnote, explained the relative weight that each of these

Senate factors carries. The Court explained:

54

Under a 'functional' view of the political process mandated by § 2, S.Rep., at 30, n. 120, U.S.Code Cong. & Admin.News 1982, p. 208, the most important Senate Report factors bearing on § 2 challenges to multimember districts are 'the extent to which minority group members have been elected to public office in the jurisdiction' and the 'extent to which voting in the elections of the state or political subdivision is racially polarized.' *Id.*, 28-29, U.S. Code Cong. & Admin. News 1982, p. 206. If present, the other factors, such as the lingering effects of past discrimination, the use of appeals to racial bias in election campaigns, and the use of electoral devices which enhance the dilutive effects of multimember districts when substantial white bloc voting exists – for example antibullet voting laws and majority vote requirements, are supportive of, but *not essential to*, a minority voter's claim.

In recognizing that some Senate Report factors are more important to multimember district vote dilution claims than others, the Court effectuates the intent of Congress. It is obvious that unless minority group members experience substantial difficulty electing representatives of their choice, they cannot prove that a challenged electoral mechanism impairs their ability "to elect." § 2(b). And, where the contested electoral structure is a multimember district, commentators and courts agree that in the absence of significant white bloc voting it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters. See, e.g., *McMillan v. Escambia County, Fla.,* 748 F.2d 1037, 1043 (CA5 1984); *United States v. Marengo County Comm'n,* 731 F.2d 1546, 1566 (CA11), *appeal dism'd and cert. denied,* 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984); *Nevett v. Sides,* 571 F.2d 209, 223 (CA5 1978), *cert. denied,* 446 U.S. 951, 100 S.Ct. 2916, 64 L.Ed.2d 807 (1980); *Johnson v. Halifax County,* 594 F. Supp. 161, 170 (EDNC 1984); Blacksher & Menefee; Engstrom & Wildgen 469; Parker 107. Consequently, if difficulty in electing and white bloc voting are not proved, minority voters have not established that the multimember structure interferes with their ability to elect their preferred candidates. Minority voters may be able to prove that they still suffer social and economic effects of past discrimination, that appeals to racial bias are employed in election campaigns, and that a majority vote is required to win a seat, but they have not demonstrated a substantial inability to elect caused by the use of a multimember district. By recognizing the primacy of the history and extent of minority electoral success and of racial bloc voting, the Court simply requires that § 2 plaintiffs prove their claim before they may be awarded relief.

The Tenth Circuit Court of Appeals has spoken to guide courts in their totality of the

circumstances inquiry. In *Sanchez,* 875 F.2d at 1492, the court gave the following instructions with

regard to the application of the Senate factors:

> First, the list is exemplary, not exclusive. The court may consider any relevant factors in reaching its conclusion. Second, there is no requirement that any particular number of factors be proved or that a majority of them point one way or the other. Third, whether the political processes are "equally open" depends on a searching practical evaluation of the past and present reality and upon a functional view of the political process.

(Citing *Gingles*, 478 U.S. at 46).

In creating the so-called "Senate Factors," the Committee gave further instructions for their use: "While these enumerated factors will often be the most relevant ones, in some cases other factors will be indicative of the alleged dilution. The cases demonstrate, and the Committee intends that there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." 82 U.S.C.C.A.N. 207. Then, in a footnote, the Committee elaborated: "The courts ordinarily have not used these factors, nor does the Committee intend them to be used, as a mechanical 'point counting' device. The failure of plaintiff to establish any particular factor, is not rebuttal evidence of non-dilution. Rather, the provision requires the court's overall judgment, based on the totality of circumstances and guided by those relevant factors in the particular case, of whether the voting strength of minority voters is . . . 'minimized or canceled out.'" *Id.* at n. 118. See also *Uno v. City of Holyoke*, 72 F.3d 973, 980 (1st Cir. 1995) ("One road that we believe remains open to a court called upon to examine the totality of the circumstances in a vote dilution case is to mull other factors, apart from racial bias, that may have caused the white bloc voting identified in the third *Gingles* precondition.")

**The Extent of Any History of Official Discrimination in the State or Political Subdivision
that Touched the Right of the Minority Group to Register, to Vote, or Otherwise to
Participate in the Democratic Process**

Indians in Fremont County certainly have access to registration and voting[10], and indeed, the

Court heard testimony from several of the plaintiffs that they had never experienced any obstacles

to voting. Ms. McAdams testified that she believed that she can participate in the electoral processes

equally with non-Indians. Tr. Trans. at 1027. However, she also testified that she did not believe that

was true for the majority of Native people "because they're not as bold as I am." Tr. Trans. at 1027.

Mr. Collins testified that he had never had any difficulties or obstacles with regard to registering or

voting, and that he has equal access to the political and electoral process with non-Indian citizens.

Tr. Trans. at 634. Ms. Bergie testified that she has voted regularly in the primary and general

elections, Tr. Trans. at 686, and Mr. Large testified that he believes that the Democratic party is open

to Indians who want to participate, and that the Republican party probably is too. Tr. Trans. at 1074-

1075.


**The Extent to Which Voting in the Elections of the State or Political Subdivision is Racially
Polarized**

As the Court discussed earlier, voting in the elections for the County Commission is racially

polarized. Much of the discussion with respect to this factor is similar to that of the third *Gingles*

factor. In *Sanchez,* 97 F.3d 1303, the Tenth Circuit seems to consider this factor as part of the third

---

[10] The Court recognizes the effort made by Julie Freese, the Fremont County Clerk, to
facilitate voter registration on the WRIR.

*Gingles* factor, and does not address this Senate factor in conjunction with its totality of the circumstances discussion. That said, the following observations are offered. The Court heard testimony on this factor both from the experts as well as from lay witnesses. This factor is related to both the second and third *Gingles* factors. The Tenth Circuit Court of Appeals has instructed courts as to what to consider in a determination of whether racially polarized voting exists.

In *Sanchez*, 97 F.3d at 1316-17, the court, while considering the second and third *Gingles* factors, explained that, "'the legal standard for the existence of racially polarized voting looks only to the difference between how majority votes and minority votes were cast. . .'"(citing *Collins v. City of Norfolk, Va.*, 816 F.2d 932, 935 (4th Cir.1987)). The Court also explained that "racial polarization or bloc voting 'exists where there is a consistent relationship between the race of the voter and the way in which the voter votes . . . or to put it differently, where black voters and white voters vote differently.'" *Sanchez*, 97 F.3d at 1312 (quoting *Gingles*, 478 U.S. at 53 n. 21).

In this case, the statistical evidence produced by both parties demonstrates that voting in Fremont County is highly polarized along racial lines. Pl. Exs. 239, 240 (Reports of Steven P. Cole); Def. Exs. B-M (Reports of Ronald E. Weber). The Court received the following evidence on racial polarization.

Dr. Cole testified that his approach to analyzing racial polarization is to look to who would get elected if Indians were voting alone and who would get elected if whites were voting alone. Tr. Trans. at 146. If the two sets of candidates are different for white voters and Indian voters, that would be indicative of racially polarized voting. Tr. Trans. at 146. Dr. Cole pointed to several

58

examples. His calculations show that in the 2000 general election, 88 % of Native voters voted for Ratliff and 51% voted for Urbigkeit. Only 34% of non-Indian voters voted for Ratliff, and 30% percent voted for Urbigkeit. Ratliff and Urbigkeit lost in the general election, but Thompson and Allen won. This provides a striking example of racially polarized voting. Only 4% of Indian voters voted for Thompson, but 54% of non-Indian voters voted for Thompson. Only 11% of Indian voters voted for Allen, but 49% of non-Indian voters voted for Allen. Ex. 239, p. 29, Table 2; Tr. Trans. at 146. If whites were voting alone, they would have elected Thompson and Allen, who were the actual winners of the election. If Indian voters were voting alone, their County Commissioners would be Ratliff and Urbigkeit, with 88% and 51% of the vote. Tr. Trans. at 146. In sum, Dr. Cole found that voting was polarized in 10 (91%) out of the 11 endogenous general elections that he analyzed. Pl. Exs. 239, 240, Tables 2 & 4 (Reports of Steven P. Cole), 365 (Table A5); Tr. Trans. at 145-48. He characterizes this as a "high level of racially polarized voting." Tr. Trans. at 147-48.

White crossover voting evidences the white support for Indian-preferred candidates. According to Cole, the white crossover vote for the 21 Indian preferred candidates in those 11 general elections ranged from 21% to 54%. Pl. Exs. 239, 240 (Reports of Steven P. Cole), 365 (Table A7); Tr. Trans. at. 148-49. The unweighted average white crossover vote was 34%, and the median white crossover vote was 31%. Pl. Exs. 239, 240 (Reports of Steven P. Cole), 365 (Table A7); Tr. Trans. at 148-49. Dr. Cole's conclusion, based on those statistics, was that "there's not a lot of white support for these preferred candidates." Tr. Trans. at 149.

In exogenous elections, Dr. Cole's statistics reveal a very similar pattern. Dr. Cole analyzed

House District races from 1992-2006, House at-large races from 1986-1990, and the two-term County Commission race in 1986. Out of 11 exogenous general elections that he analyzed, Dr. Cole's results show that 10 elections (91%) were polarized. Pl. Exs. 239, 240 (Reports of Steven P. Cole), 365 (Table A6); Tr. Trans. at 148. The white crossover vote for the 14 Indian preferred candidates in those 11 elections ranged from 13% to 70%. Pl. Exs. 239, 240 (Reports of Steven P. Cole), 365 (Table A8). The unweighted average white crossover vote was 45%, and the median white crossover vote was 50%. Pl. Exs. 239, 240 (Reports of Steven P. Cole), 365 (Table A8). The plaintiffs submit that the crossover vote appears to be skewed by unusually high crossover voting in the 1986, 1988, and 1990 elections. With those elections removed, the unweighted average white crossover vote for Indian-preferred candidates drops to 29%, with a median white crossover vote of 30%. Pl. Exs. 239, 240 (Reports of Dr. Steven P. Cole), 365 (Table A9). The Court notes, however, that of the 14 candidates for which crossover voting was analyzed, 7 had a crossover voting rate of over 50%. Crossover voting rates of 65% and 70% are also seen. The Court is not convinced that the "unusually high" instances of crossover voting are particularly high when compared to the other numbers.

Dr. Weber also testified about his findings pertaining to this factor. Dr. Weber employed a different definition of "polarized." Dr. Weber explained that to find racial polarization in a multicandidate contest, he matches up the minority-preferred candidate with a candidate that was preferred by the non-minority group. Tr. Trans. at 388. He explained the standard that he applies: "I expect that the cohesively preferred candidate of one group be juxtaposed or positioned against

60

the cohesive behavior of the other group behind a different candidate of choice, and then it becomes

a question of whether or not those differences are very clear. And I use the cohesion levels to define

clearness for the two candidates. And then we ultimately get to the question of whether or not the

candidate cohesively preferred by the minority group, the Native American group, is defeated by the

voting of the other group." Tr. Trans. at 388-89. In his report, Dr. Weber explained his approach

with more detail:

> I employ conventional definitions of cohesion and polarization in voting as I have
> done in previous cases. In elections for single seat offices, when a group's percentage
> of support for a candidate of choice is at least 60 percent of the total vote for the two
> top candidates, at least 50 percent of the total vote among all candidates, and the
> participation rate of the group is at least 10 percent of the group voting age
> population, I will classify the group as acting cohesively. But, because cohesion is
> really measured on a continuum, I prefer to break cohesion into two categories where
> there are gradations of cohesion in voting with levels of 80 percent or more of Native
> American voters supporting a preferred candidate indicating strong levels of
> cohesion, and levels between 60 and 79 percent indicating moderate levels of
> minority cohesion. Then, to determine the degree of polarization in voting for the
> single seat contests, I must also analyze non-Native American (white) voter
> preferences. If non-Native American (white) voters give 80 percent or higher support
> to a preferred candidate, while Native American voters give a similar level of support
> to a different preferred candidate, this would be an example of strong polarization in
> voting. But if non-Native American (white) voters only give 60-79 percent support
> to a preferred candidate, while Native American voters only give 60-79 percent
> support to a different preferred candidate, then the degree of polarization in voting
> would be labeled as moderate. Because most of the elections I am analyzing in this
> case have multiple winner in the At-Large elections, I have adjusted the group
> estimates I calculate by estimated group turnout rates. This process enables me to
> directly report the cohesion estimates for each group as if the candidates were
> competing in single-winner, head to head contests. **In order for polarization to
> occur, the candidate of choice cohesively preferred by one group, must be
> juxtaposed against the cohesive behavior of the other group behind a different
> candidate of choice.**

Ex. B. at 30-31 (emphasis added).

Dr. Weber comes to a very different conclusion regarding racial polarization. In his report, he explained that he found that racial polarization in voting occurred in elections for one of the 21 posts in the Democratic primary, and two of the 29 posts in the general election. In sum, over the two sets of elections, he found that racial polarization in voting occurred in three of the contests for the 50 positions, which means it occurred in six percent of the elections.

Dr. Weber's statistics tell much the same story as Dr. Cole, but he nonetheless concludes that very few elections in Fremont County have been polarized. Def. Exs. B-M (Reports of Dr. Ronald E. Weber). This, as noted in more detail below, is because Dr. Weber used a definition of "polarized" that is at odds with *Gingles* and *Sanchez v. Colorado.* Even so, it is possible to examine Dr. Weber's statistics without regard for his definition, and doing so reveals the same high degree of polarization found by Dr. Cole.

In endogenous elections, Dr. Weber's analyses show that voting was polarized in 10 (91%) out of the 11 general elections that he analyzed. Def. Exs. B-M (Reports of Ronald E. Weber), Pl. Ex. 366 (Table B6); Tr. Trans. at 150-51 (Steven P. Cole), 490-93 (Ronald E. Weber). Dr. Weber did not provide crossover voting estimates for the 2006 general election, but his estimate of the white crossover vote for the 19 Indian preferred candidates in the other 10 endogenous elections ranged from 21% to 53%. Def. Exs. B-M (Reports of Ronald E. Weber), Pls. Ex. 366 (Table B8); Tr. Trans. at 150-51 (Steven P. Cole), 490-93 (Ronald E. Weber). The unweighted average white crossover vote was 33%, and the median white crossover vote was 30%. Def. Exs. B-M (Reports of Ronald E. Weber), Pl. Ex. 366 (Table B8); Tr. Trans. at 150-51 (Steven P. Cole), 490-93 (Ronald

E. Weber). In the 11 exogenous general elections that Dr. Cole analyzed, Dr. Weber's report shows very similar results. Ten (91%) out of the 11 exogenous general elections were polarized. Def. Exs. B-M (Reports of Ronald E. Weber), Pl. Ex. 366 (Table B7); Tr. Trans. at 150-51 (Steven P. Cole), 490-93 (Ronald E. Weber).

The white crossover vote for the 14 Indian preferred candidates in those 11 elections ranged from 13% to 70%. Def. Exs. B-M (Reports of Ronald E. Weber), Pl. Ex. 366 (Table B9); Tr. Trans. at 150-51 (Steven P. Cole), 490-93 (Ronald E. Weber). The unweighted average white crossover vote was 45%, and the median white crossover vote was 50%. Def. Exs. B-M (Reports of Ronald E. Weber), Pl. Ex. 366 (Table B9); Tr. Trans. at 150-51 (Steven P. Cole), 490-93 (Ronald E. Weber). Like Dr. Cole's results, Dr. Weber's crossover estimates appear to be skewed upward by the 1986, 1988 and 1990 general election results. With those elections removed, the unweighted average white crossover vote for Indian-preferred candidates drops to 30%, with a median white crossover vote of 30%. Def. Exs. B-M (Reports of Ronald E. Weber), Pl. Ex. 366 (Table 11); Tr. Trans. at 150-51 (Steven P. Cole), 490-93 (Ronald E. Weber). Adding in the pre-1986 exogenous general elections that only Dr. Weber analyzed yields an unweighted average white crossover vote of 35% and a median white crossover vote of 37%. Def. Exs. B-M (Reports of Ronald E. Weber), Pl. Ex. 366 (Table B12); Tr. Trans. at 150-51 (Steven P. Cole), 490-93 (Ronald E. Weber).

Taking a broader look at the statistics also reveals telling signs of polarization. The results of both experts' analyses show, for example, that Indians have had no success in electing candidates to the County Commission when they have expressed their strongest preferences. According to Dr.

63

Cole's estimates, Indian voters supported Indian candidate Ratliff with 88% of their vote in the 2000 general election, but Ratliff got only 34% of the non-Indian vote and was defeated. Pl. Exs. 239, 240, Table 2 (Reports of Steven P. Cole). Indian voters supported Indian candidate McAdams with 90% of their vote in the 1996 general election, but McAdams was the last choice of non-Indian voters, getting only 24% of the non-Indian vote, and was defeated. Pl. Exs. 239, 240, Table 2 (Reports of Steven P. Cole). Indian voters supported non-Indian candidate Twitchell with 85% of their vote in the 2004 general election, but Twitchell was defeated by a large margin even though she got 38% of the non-Indian vote. Pl. Exs. 239, 240, Table 4 (Reports of Steven P. Cole).

The statistics also show that Indian and non-Indian voters in Fremont County have had widely divergent preferences in endogenous elections. Out of the 28 candidates who would have been elected over the years if the primary and general elections had been held only among Indian voters, only 5 of those candidates – all of them non-Indian – would have been elected if the elections had been held only among the non-Indian voters. Pl. Exs. 239, 240, Tables 2 & 4 (Reports of Steven P. Cole); Def. Exs. B-M (Reports of Ronald E. Weber). Both parties' statistics show that non-Indian voters have had firm control over the outcome of elections. Out of the 28 candidates who would have been elected if the elections had been held only among non-Indian voters, only 1 candidate has ever failed ultimately to win election. Pl. Exs. 239, 240 (Reports of Steven P. Cole); Def. Exs. B-M (Reports of Ronald E. Weber). The Court is also mindful that no single statistic provides courts with a shortcut to determine whether this voting scheme unlawfully dilutes minority voting strength. *Johnson v. DeGrandy*, 512 U.S. 997, 1020-1021, 114 S.Ct. 2647, 2661-2662

(1994).

Again, all of the available statistical evidence tells the same story. Voting in Fremont County is highly polarized. This is particularly true in elections for the County Commission, where white crossover voting has tended to be very low, but the racial dynamic is present across all of the elections analyzed by both parties. The Court rejects the definition of racially polarized voting espoused by the defendants' expert statistician, Dr. Weber, who asserts that an election is racially polarized only when minority and white voters support opposing candidates with at least 60% of their vote. Def. Ex. B; Tr. Trans. at 501-02 (Ronald. E. Weber). For example, Dr. Weber does not regard the 1996 general election as racially polarized, even though Weber's estimates show that Indian candidate McAdams received 87% of the Indian vote, because white voters supported the victorious candidates, Runner and Allen, with 59.7% and 54.5% of their vote, respectively. Def. Ex. B. Dr. Weber's approach to racially polarized voting is inconsistent with *Gingles*. 478 U.S. at 80; Tr. Trans. at 510-17 (Ronald E. Weber). In fact, *Gingles* would have come out differently if the Supreme Court had used Dr. Weber's arbitrary threshold because several of the elections in which the Court found polarization to be present did not meet Dr. Weber's standard. For instance, the Supreme Court in *Gingles* found polarization to exist in House District 21 based on the following election results:

| House District 21 | | | | |
|---|---|---|---|---|
| | Primary | | General | |
| | *White* | *Black* | *White* | *Black* |
| 1978 (Blue) | 21 | 76 | n/a | n/a |
| 1980 (Blue) | 31 | 81 | 44 | 90 |
| 1982 (Blue) | 39 | 82 | 45 | 91 |

478 U.S. at 80. Under Dr. Weber's definition, however, the last two elections would not have been considered polarized because of the high white crossover vote for the minority-preferred candidate, Blue. Given that level of crossover voting, white support for the opposing candidate could not have exceeded Dr. Weber's 60% threshold.

Dr. Weber's arbitrary threshold approach has also been rejected by the Eighth and Ninth Circuits. *See Bone Shirt v. Hazeltine*, 461 F.3d at 1021. In his concurring opinion in *Bone Shirt*, Judge Gruender expressly rejected the defendants' argument that an election was not "'polarized' unless at least 60 percent of Indians voted for the MPC <u>and</u> at least 60 percent of the white majority voted against him." *Id.* at 1026. According to the concurrence, "[n]othing in case law prescribes that the white majority bloc must be of a certain size beyond the requirement that the bloc be large enough to defeat the [minority-preferred candidate]." *Id.* at 1026-1027.

Similarly, in *United States v. Blaine County*, Montana, 363 F.3d 897, 911 (9th Cir. 2004), the court rejected the defendants' argument that "the district court erred in its analysis of white bloc voting because the court did not require white voter cohesion levels to surpass 60 percent." As the court concluded, "[t]his contention flatly ignores the test laid out in *Gingles* for white bloc voting."

*Id.*

Defendants were unable to point to a single case that had ever adopted Dr. Weber's definition of racially polarized voting.   Under these circumstances, and for the reasons set out in detail above, the Court finds that the second Senate factor -- the extent to which voting is racially polarized -- weighs heavily in favor of the plaintiffs.

Lay witnesses for both parties agreed that voting in Fremont County was racially polarized. Gary Collins said "polarization [was] evident in the voting process."   Tr. Trans. at 608 (Gary Collins). Rep. Goggles didn't think a Native American could be elected to the County Commission under the existing at-large system.   "Just the numbers.   The numbers already tell you," he said. Patrick Goggles Depo. at 88, lines 13-14.  Scott Ratliff, an experienced Fremont County politician who served six terms in the state legislature (1980-1992), said whites tend to vote cohesively for white candidates, and that voting was racially polarized. Tr. Trans. at 697 (Scott Ratliff). "[T]here are people that would vote against me because I'm Native," he said.  "I think they don't like Indians." *Id.* at 710 (Scott Ratliff).  Richard Brannan thinks whites vote as a bloc for white candidates, and that "our vote is diluted" under the at-large system. Tr. Trans. at 884-85 (Richard Brannan). Indians tend to vote for Indian candidates, he said, because "they have the same background and they understand the needs that we have." *Id.* Ivan Posey thinks people in Fremont County vote along racial lines "for the most part," and that Indians tend to vote for Indian candidates and whites for white candidates. Tr. Trans at 952-53 (Ivan Posey).  Lucille McAdams agreed that voting is racially polarized and that whites tend to vote for white candidates in county elections.  Tr. Trans. at 1010–11 (Emma Lucille

McAdams).  Indians tend to vote for Indian candidates, she said, "primarily . . . if they know the

person."  *Id.* at 1011 (Emma Lucille McAdams). James Large was pessimistic about his chances

when he ran for the County Commission in 1986.  He felt he would not get good white support

because "there's some people still fighting the old . . . settler fights, you know, circle the wagon

trains.  And I think that it had a bearing on whether they was going to vote for an Indian or not." Tr.

Trans. at 1061 (James Large).  He also thought his "pro-Indian" stance hurt him with non-Indian

voters.  *Id.* at 1072 (James Large). Keja Whiteman said there were several reasons it was harder for

her to get elected than people she was running against, one of which was that she is "a Native."  Tr.

Trans. at 1512 (Keja Whiteman). Gary Jennings said he did not know if people voted on racial lines,

but he assumed Indian candidates got support from Indian voters because "[w]e tend to support our

own."  Gary Jennings Dep., p. 34 line 1. Michelle Hoffman has been actively involved in politics,

having been elected to the Board of Fremont County School District No. 1, and having served as

chair of the Fremont County Democratic Party for six years.  She also ran for State Superintendent

of Public Instruction in 2006.  Although she carried Fremont County, she lost statewide.  Tr. Trans.

at 1080-82 (Michelle Hoffman).  She said she was told on at least five occasions that she had three

strikes against her -- "I was a woman, a Democrat in Wyoming, and I lived on the reservation."  *Id.*

at 1084 (Michelle Hoffman). Based on her experience as chair of the county Democratic Party,

Hoffman said "it seemed that votes were cast based upon racial identity."  Native Americans "ran

good races, hard races [for the  County Commission], but came up short in the voting. . . . I don't

know if there was ever a chance there." Tr. Trans. at 1083-84 (Michelle Hoffman). Tom Throop said

whites and Indians in Fremont County "vote differently." They are "separate communities of interest, without a question. They view the world differently. They have different issues And, you know, I think as a result there is, for lack of a better way to describe it, you know, certain ethnic voting patterns that do play themselves out in the county." Tr. Trans. at 1182-83 (Tom Throop). When asked by counsel at trial, whether he thought that people tend to vote on racial lines in Riverton and Fremont county, Mayor John Vincent responded, "You know, again, I've never really done any study, so I -- I'm sure some people do and some people don't. I mean, that's probably a good political answer. I guess I don't know. What I can -- I suspect that, given the comments I've heard from time to time and things like that, that there are some people who certainly do that." Tr. Trans. at 1756-57 (John Vincent). Vincent thinks Patrick Goggles got elected to the legislature because House District 33 was majority Indian. "Well, he's Native American. It's a Native American district. . . . I do think there's a connection." *Id.* at 1757 (John Vincent). Based on the testimony given by the witnesses, both lay and expert, and based upon the statistics, the Court finds that voting in Fremont County is racially polarized.

## The Extent to Which the State or Political Subdivision has Used Unusually Large Election Districts, Majority Vote Requirements, Anti-single Shot Provisions, or Other Voting Practices or Procedure that May Enhance the Opportunity for Discrimination Against the Minority Group

Fremont County does not use majority vote requirements or anti-single shot provisions. Voters in the County are permitted to use the single-shot voting strategy to enhance the strength of their vote. However, the County is large, making it more difficult for candidates to campaign,

particularly if they are running on limited resources. The County also utilizes staggered terms of office, which weakens the effect of single-shot voting.

Fremont County is the second-largest county in the state. It contains 9,250 square miles. Tr. Trans. at 21-2 (William Cooper). There can be little dispute that the large size of Fremont County makes it more difficult to campaign countywide, especially for Indian candidates who lack access to financial resources, both personal and community. James Large said campaigning at-large in Fremont County was "a big problem." Tr. Trans. at 1061 (James Large). There was not only the large size of the county to contend with, but "people within the county are spread all over the county." *Id.* (James Large). Gary Jennings conceded that running countywide imposes a hardship in campaigning for the county commission "[i]n the sense you have more ground to cover if you want to cover all the ground, yes." Gary Jennings Depo., at 42, lines 15-6. Lucille McAdams said it was expensive campaigning at-large in Fremont County because of the distances one had to travel. She also thinks the at-large system discourages Indians from being candidates. "I think the cost is probably a big deterrent," she said. Tr. Trans. at 1008 (Emma Lucille McAdams). Rep. Goggles thinks it would be more difficult to run for the legislature at-large in Fremont County rather than from House District 33. He thinks he might win but, given the added cost of campaigning only if "[i]f I were a millionaire." Patrick Goggles Depo., at 87, line 7. Goggles also thinks the at-large system discourages Indians from running for the County Commission. *Id.* at 92, lines 17-19. Commissioner Thompson said because of the large size of Fremont County it would be an "immense task" to campaign door to door, and that "It would not be impossible, but it would be very difficult,

70

and it would harm my profession or my ranching profession. I could." Tr. Trans. at 1468-69

(Douglas Thompson). Defendant Whiteman said the size of Fremont County made it "difficult" for

her to campaign. Tr. Trans. at 1514-1514 (Keja Whiteman). Commissioner Hickerson agreed that

the large size of the county is a disadvantage in campaigning to those who have a poor financial

situation. Tr. Trans. at 1638-39 (Patrick Hickerson). Hickerson also said the at-large system of

elections made it more difficult for Indian voters to elect candidates of their choice to the County

Commission. "[T]he cost of running a campaign could be an issue," he said. *Id.* at 1639-1640

(Patrick Hickerson). Defendant Freese agreed that the size of Fremont County makes it difficult to

get around and contact voters. Tr. Trans. at 1733 (Julie Freese).

In addition, Fremont County uses staggered terms in elections for the County Commission,

with two members elected in presidential election years and three members in off year elections.

Final Pretrial Order, pp. 2-4. As Defendants' expert Dr. Weber testified, staggered terms limit the

opportunity of Indian voters to use single-shot voting in attempting to elect candidates of their

choice. Tr. Trans. at 486-87 (Ronald E. Weber).

### If There is a Candidate Slating Process, Whether the Members of the Minority Group Have Been Denied Access to that Process

There is no evidence that a slating process exists in this case. There is an open primary

system.

**The Extent to Which Members of the Minority Group in the State or Political Subdivision Bear the Effects of Discrimination in Such Areas as Education, Employment, and Health, which Hinder their Ability to Participate Effectively in the Political Process**

With regard to this factor, the Senate Report explains, "The courts have recognized that disproportionate educational, employment, income level and living conditions arising from past discrimination tend to depress minority political participation." 82 U.S.C.C.A.N. at 207, n. 114. The evidence presented to this Court indisputably illustrates that American Indians in Fremont County have a lower socio-economic status than non-Indians. The Court finds that this hinders the ability of Indians in Fremont County to fully participate in the political process.

The Supreme Court has recognized that economic disparities affect political participation. In *Gingles* the Court explained:

> Congress intended that the Voting Rights Act eradicate inequalities in political opportunities that exist due to the vestigial effects of past purposeful discrimination. Both this Court and other federal courts have recognized that political participation by minorities tends to be depressed where minority group members suffer effects of prior discrimination such as inferior education, poor employment opportunities, and low incomes. . . Courts and commentators have recognized further that candidates generally must spend more money in order to win election in a multimember district than in a single-member district. . . If, because of inferior education and poor employment opportunities, blacks earn less than whites, they will not be able to provide the candidates of their choice with the same level of financial support that whites can provide theirs. Thus, electoral losses by candidates preferred by the black community may well be attributable in part to the fact that their white opponents outspend them.

*Gingles*, 478 U.S. at 70 (internal citations omitted).

According to the 2000 census, of Indians 25 years of age and over in Fremont County, 24.0% have not finished high school, compared to a 12.7% dropout rate for their white counterparts. Of

Indians 25 years of age and over, 6.4% have a bachelor's degree or higher, compared to a 22.7% rate achieved by whites. In April of 2000, the unemployment rate for persons 16 and over stood at 26.9% for Indians, compared to 5.1% for whites. Single-parent female households comprise 24.9% of Indian family households (ages 16 to 64) in Fremont County, compared to 10.0% of white family households. Renters comprise 39.4% of Indian households, compared to the 24.3% rate for white households. Of Indian households who rent, 18.7% pay more than half their income to rent, while white households who rent pay 10.1%. In Fremont County, 19.3% of Indian households live under crowded conditions, compared to 2.2% of white households. Indian households without complete plumbing number 4.0%, compared to 1.1% of white households in the county. The median home value for Indian homeowners is 61.9% of white households – $57,200 versus $92,400. 26.8% of Indian households in Fremont County reported incomes below $10,000 in 1999, compared to 9.8% of white households. In 1999, the median family income of Indians was $22,656 – barely more than half (54.4 %) of the $41,636 median income received by white families. In 1999, the Indian per capita income of $7,390 was 39.2% of the $18,823 per capita income for the county's white population. In 1999, there were 2,813 Indians (41.6%) living below the poverty line, while 2,978 whites (11.4%) were below poverty. 50.4% of Indian children under five live in poverty, while 16.1% of white children under five live in poverty. The median earnings level of Indians working full-time, year-round in 1999 was 79.8% of their white counterparts – $21,524 versus $26,983. 24.0% of Indian households in the county lack telephones, compared to 3.1% of white households. Indian households lacking a vehicle are 8.3%. White households lacking a vehicle are 4.5%. The

73

Court finds that the depressed socio-economic status of Indians and its impact on political participation weigh heavily in favor of a finding of vote dilution in this case.

## Whether Political Campaigns Have been Characterized by Overt or Subtle Racial Appeals

The Court heard evidence that is ostensibly pertinent to this factor. The evidence included the following: Scott Ratliff, a member of the Eastern Shoshone Tribe, was first elected to the state legislature in 1980. When he ran for re-election in 1982, a political action committee, known as the Committee to Defeat Scott Ratliff, was formed in Fremont County. The committee took out ads, Ratliff said, one of which "was a reminder that Scott Ratliff was an enrolled member and that he would be voting on water issues."[11] Tr. Trans. at 697-98 (Scott Ratliff). Ratliff also got hate letters saying the only reason he was running "was either to take care of my family, you know, as ranchers or the Indian community." Id. at 701 (Scott Ratliff). Patrick Goggles thinks Ratliff was hurt in his subsequent campaign for the County Commission because "he had long hair," and he "advocated a lot for Indian education. That type of thing." Patrick Goggles Depo., at 91, lines 12-15, 17-18.

During her campaign, the editor of the Lander Journal told Emma McAdams, a member of the Eastern Shoshone Tribe, that people in Fremont County probably would not vote for her because

---

[11] In response, the defendants submit that the water issue is a political, rather than racial, issue. The defendant pointed out that when the Committee to Defeat Scott Ratliff was formed, a contentious water rights litigation was at its height. As such, the defendant posited, the opposition to Scott Ratliff's candidacy was based on a perception of his support of the Tribe's bid for water, not on his race. The Court is not comfortable drawing such a thin line or conclusions that racial factors did not influence Ratliff's race.

several years ago a boy named McAdams had shot a non-Indian boy in Sinks Canyon. During her campaign she had problems with people taking down her campaign signs. In Lander, her brother-in-law caught some kids, whom she assumed were white because Lander is predominantly white, destroying some of her signs. Tr. Trans. at 1009-1010, 1017 (Emma Lucille McAdams).

Gary Collins ran for the County Commission in 1986 "to provide the Indian perspective and to support the reservation initiatives that I saw was in need," such as the provision of public services, environmental concerns, tourism, economic development, and access to utilities. Tr. Trans. at 600-02 (Gary Collins). But he thinks he got a negative response from white voters who took him "to be a threat to the non-Indian community that somebody was actually moving forward in the tribal arena." *Id.* at 603 (Gary Collins). Collins' mother, who is Swedish and worked in a store in Riverton, heard comments from people that "we've got to watch Gary Collins, he's going to take our water." *Id.*

Valerie Thomas decided to run for the County Commission in 1992 in part in protest over the decision of the Commission to consider the location of a nuclear waste dump in the county as a form of economic development. Tr. Trans. at 1238-39 (Valerie Thomas). She campaigned "on the basis that there was little to no accountability on the Board of Commissioners." *Id.* at 1240 (Valerie Thomas). Another of Thomas's big campaign issues was calling for a referendum on adopting single member district elections for the County Commission. She believed Lander and the southern part of the county were not adequately represented on the commission, all of whose members came from the northern half of the county. Tr. Trans. at 1242 (Valerie Thomas).

Residents of the Wind River Indian Reservation supported the adoption of district elections, while non-Indians off the reservation frequently opposed it. Some thought they would have more influence voting for five commissioners, but about half of those who objected and refused to sign her petition to hold a referendum, Thomas said, did so because "the risk would be that there would be a representative from the reservation." *Id.* at 1244-1245 (Valerie Thomas). The referendum on single member districts made it on the 1992 general election ballot, but was defeated by a vote of 55% to 45%. Tr. Trans. at 1246 (Valerie Thomas).

During one of John Vincent's campaigns for mayor, someone went door to door in Riverton warning people not to vote for Vincent "because if elected I was going to give Riverton back to the Indians," he said. Tr. Trans. at 1752 (John Vincent).

Single member districts, and their racial impact, were also an important issue in the 2006 election for County Commission. Scott Ratliff testified regarding the candidacy of Dennis Heckart. When asked if Heckart ran on any particular issues, Ratliff responded:

A. He did. He ran on the idea of districting the county, that he felt -- in fact, he came to the Economic Development Group in which I mentioned that I attend and indicated that he thought that was something that, that needed, that as he'd traveled around the county campaigning that he discovered that there was a lot of disgruntlement in communities not being represented by County Commissioners.

Q. Was there any concern about representation of the Wind River Indian Reservation expressed?

76

A.  Well, there was by me.  I mean, I -- no, I mean, at that particular meeting -- said

that I thought districting would help because the reservation certainly hadn't been

represented.

Q.  Well, how did Mr. Heckart do in that election?

A.  He was the top votegetter.  So, I mean, I think his message was a bit of a mandate

that people agreed that there had not been good representative -- representation.

Q.  Do you think it was a mandate on the need to have single-member districts?

A.  It would seem to me like that was certainly part of his message.

Tr. Trans. at 712-13 (Scott Ratliff).

Keja Whiteman did not initially take a position on district versus at-large elections for the

County Commission.  However, during the course of the campaign some candidates talked about

"division of Fremont County, and that did not appeal to me at all," she said, "and so I took, I think,

a real open stand that I was running to unify rather than divide the county."  Tr. Trans. at 1500 (Keja

Whiteman).  Whiteman began to support at-large elections "during the campaign," she said.  Tr.

Trans. at 1524-1525 (Keja Whiteman).  She told people, "I didn't appreciate the idea of dividing

Fremont County."  *Id.* at 1500 (Keja Whiteman).  Her support of at-large elections, she said, "got me

a lot of attention . . . from people at the grocery store, from people at forums.  Whenever I was out

and about people were really interested in the idea of unifying the county."  *Id.*  The issue of district

elections was also covered in the newspapers, she said.  *Id.* at 1529 (Keja Whiteman).  At-large

elections became even more of an issue in the general election, she said.  *Id.* at 1502 (Keja

77

Whiteman).

Commissioner Hickerson acknowledged that Whiteman in her 2006 campaign addressed "the issues of the day, for example, the county split." Tr. Trans. at 1618 (Patrick Hickerson). Hickerson also got questions on several occasions about the instant litigation. *Id.* at 1619 (Patrick Hickerson). James Large was of the opinion that the pendency of the present lawsuit "had a lot of impact" on Whiteman's election. He believes her election was going to be used "to defuse the issue of the lawsuit." Tr. Trans, at 1065 (James Large). Whiteman admitted that the issue of district elections in Fremont County is racially charged. She has made the statement that district elections "will take us back another 10 years in race relations in Fremont County." Tr. Trans. at 1519 (Keja Whiteman). She admitted that the objections she has heard to district elections have come from the "non-Indian community." *Id.* at 1526 (Keja Whiteman). The creation of majority Indian House District 33, she said, "may have benefitted the Native community, but the non-Native community has more resentfulness. And I think that the majority of the racism that I see is coming from the non-Native community, and that's why I made that statement." *Id.* at 1526-27 (Keja Whiteman).

Mayor John Vincent, however, says the districting system for the state legislature, far from setting race relations back, has improved Indian/white relations. To support that view he cites the recent creation of a Select Tribal Relations Committee and tribal liaison positions in the state government. Tr. Trans. at 1766-67 (John Vincent).

## The Extent to Which Members of the Minority Group Have Been Elected to Public Office in the Jurisdiction

As noted above, the Supreme Court has recognized that this is one of the most important factors in the totality of the circumstances inquiry. *See Gingles*, 478 U.S. at 48-9 n. 15. The Tenth Circuit Court of Appeals has stated that "the lack of success of [Indian] candidates is a strong factor tending to show vote dilution." *Sanchez v. Bond*, 875 F.2d 1488, 1496 (10th Cir. 1989). "The fact that no members of a minority group have been elected to office over an extended period of time is probative. However, the election of a few minority candidates does not 'necessarily foreclose the possibility of dilution of the black vote,' in violation of [Section 2]." 82 U.S.C.C.A.N. 207 n. 115. The Tenth Circuit Court of Appeals has explained that "some success at the polls does not negate a showing of polarized voting or disprove the existence of vote dilution. Moreover, 'exogenous elections -- those not involving the particular office at issue -- are less probative than elections involving the specific office that is the subject of the litigation.'" *Sanchez v. State of Colorado*, 97 F.3d 1303, 1325-25 (10th Cir. 1996) (quoting *Clark v. Calhoun County, Miss.*, 88 F.3d 1393, 1397 (5th Cir. 1996)).

The Court finds it significant that only one Indian, Keja Whiteman, has ever been elected to the County Commission. There have been a total of eight Indian candidacies for the County Commission. These were Keja Whiteman and Goggles in 2006, Ratliff and A. Whiteman in 2000, McAdams in 1996, and Large, Collins, and McAdams in 1986. Pl. Exs 239, 240, Table 2 (Report of Steven P. Cole).

Although Keja Whiteman was a candidate of choice of Indian voters in the 2006 general

79

election, the first choice of Indian voters in the 2006 Democratic primary was Indian candidate W.

O. Goggles, who got 70% of the Indian vote, compared to 68% for Whiteman, and W. O. Goggles

was defeated. Ex. 240, Table 2, p. 13. Although Whiteman, a member of the Turtle Mountain Band

of Chippewa Indians, did not receive a majority of the non-Indian votes, she received more

non-Indian votes (42%) than any Indian candidate had ever received before in a general election.

All other Indian candidates for the County Commission have been defeated. Pl. Ex. 239, Table 2,

Pl. Ex. 240, Table 2 (Reports of Steven P. Cole).

Plaintiffs urge that the election of a single Indian candidate does not defeat a Section 2

challenge and suggest to the Court that it should consider that Keja Whiteman's election occurred

after the filing of this lawsuit, and that Whiteman campaigned against single member districts. The

Senate report guides the Court on this factor. The Senate report states:

> The fact that no members of a minority group have been elected to office over an
> extended period of time is probative. However, the election of a few minority
> candidates does not "necessarily foreclose the possibility of dilution of the black
> vote," in violation of this section. If it did, the possibility exists that the majority
> citizens might evade the section e.g., by manipulating the election of a "safe"
> minority candidate. "Were we to hold that a minority candidate's success at the polls
> is conclusive proof of a minority group's access to the political process, we would
> merely be inviting attempts to circumvent the Constitution . . . Instead we shall
> continue to require an independent consideration of the record."

Senate Report n. 115 (citing *Zimmer v. McKeithen*, 485 F.2d 1297, 1307 (5th Cir. 1973)).

Whiteman testified that during her campaign she took "a real open stand that I was running

to unify rather than divide the county." She testified that her position "got her a lot of attention." Tr.

Trans. at 1500. She testified that during her campaign she began to support at-large elections, but

80

that she did not communicate with the voters her support for at-large elections. Tr. Trans. at 1524. Apparently, the only time she was asked about this lawsuit was in private when she was asked about it by a reporter. Tr. Trans. at 1512. According to Whiteman, this lawsuit and districting was only brought up once in a forum, and that she never discussed the merits of this lawsuit with anyone before she began her campaign. Tr. Trans. at 1513. The evidence and testimony did not clearly suggest that Whiteman's late-developed support for at-large voting, in the guise of support for unifying the county rather than dividing the County, was actually clear opposition to districting the County.

Consideration of the above evidence does not particularly impress the Court nor send it any particular direction. The Court will not undercut Whiteman's merit by attributing her success to this litigation or to an attempt by the majority to evade § 2. Nor will it take her success as steering dispositively toward a finding for the defendants. The Court finds it probative that Keja Whiteman is the only minority candidate to succeed in a County Commission election in Fremont County, and that minority candidates are usually defeated. Whiteman herself testified that she had "three obvious reasons why it may be harder for me to get elected than the people I was running against -- I'm a Native, I'm a Democrat, and I'm a woman." Tr. Trans. at 1512. The Court also recognizes that the election of one minority candidate does not necessarily foreclose the possibility of dilution of the minority vote. In short, this suit is not won or lost on the basis of Keja Whiteman's electoral success, rather it is just one more factor to be taken into consideration in this Court's review of the totality of the circumstances.

In the 2000 election, Scott Ratliff, a member of the Eastern Shoshone Tribe, was the overwhelming choice of Indian voters, with 85% of their vote in the Democratic primary and 88% in the general election and 34% of the vote of non-Indian voters. A. Whiteman was the second choice of Indian voters in the Democratic primary, with 42% of the Indian vote, but came in last among white voters with 19% of their vote. Pl. Ex. 239, Table 2, Pl. Ex. 240, Table 2 (Reports of Steven P. Cole); Tr. Trans. at 694.

In the 1996 election, Emma Lucille McAdams, a member of the Eastern Shoshone Tribe, was the overwhelming choice of Indian voters with 79% of the Indian votes in the Democratic primary and 90% of the Indian vote in the general election. In the general election she was the last choice of non-Indian voters, with only 24% of their vote. Pl. Ex. 239, Table 2, Pl. Ex. 240, Table 2 (Reports of Steven P. Cole); Tr. Trans. at 993.

In the 1986 Democratic primary for a four year seat, James Large, a member of the Northern Arapaho Tribe, was the first choice of Indian voters in an eight candidate field with 49% of the Indian vote, but he was the last choice of non-Indian voters with only 7% of their vote and was defeated. Pl. Ex. 239, Table 2, Pl. Ex. 240, Table 2 (Reports of Steven P. Cole).

In the 1986 Democratic primary for a two year seat, Collins, a member of the Northern Arapaho Tribe, was the first choice of Indian voters in a six candidate field with 47% of the Indian vote, but he got only 11% of the non-Indian vote and was defeated. Pl. Ex. 239, Table 2, Pl. Ex. 240, Table 2 (Reports of Steven P. Cole); Tr. Trans. at 574.

Defendants argue that unsuccessful Indian candidates lost for reasons other than racial bias

82

in the white electorate. Their contention is that the defeats can be explained by partisanship, ineffective campaigning, failing to address issues of interest to a countywide audience, and running against popular incumbents. Specifically, defendants submit that James Large lost because he ran against very popular incumbents, ran an ineffective campaign, and failed to address issues of countywide interest. They submit that Gary Collins lost because he ran against a well-known local rancher, ran an ineffective campaign, and failed to address issues of countywide interest, and that Emma McAdams lost for the same reasons. Scott Ratliff, defendants argue, was wrong on the issues because the primary issues in that election were public land use and fiscal responsibility, and Mr. Ratliff's position was to increase government funding and programming.

The defense also submits that Indians have equal access to the general election process and are as likely to win election as any other democrat. The Court finds that Republicans generally win County Commission elections in Fremont County. The defendants submitted the following table to illustrate the number of democratic wins for seats on the County Commission:

83

| Year | Number of Seats | Democrats |
|------|------|------|
| 1986 | 3 | 1 |
| 1986 | 1 | 1 |
| 1988 | 2 | 1 |
| 1990 | 3 | 0 |
| 1992 | 2 | 2 |
| 1994 | 3 | 1 |
| 1996 | 2 | 0 |
| 1998 | 3 | 0 |
| 2000 | 2 | 0 |
| 2002 | 3 | 0 |
| 2004 | 2 | 0 |
| 2006 | 3 | 1 |
| **TOTAL** | 29 | 7 |

In summary, Democrats won approximately 24% of the contests. In the period between 1996-2006, one Democrat was elected in 15 contests, which comes out to 7%. Of those Democratic nominees, three were Indian. In 2006, one of those nominees was elected, meaning that American Indian nominees won an average of 33.3% of their races. In rebuttal, the plaintiffs point out that the Indian candidates who ran were qualified, and that the defendants concede that they were qualified. The plaintiffs also take issue with the evidentiary basis upon which the defendants make their argument that the disparity in successful candidates is attributable to partisanship rather than race. This rebuttal pertains to Weber's methodologies. Weber acknowledged that he used racial composition as an explanatory variable in his analysis, and that if he had the data, he could have used partisanship as an explanatory variable, but that he had not done so. Tr. Trans. at 473. He also testified that a multivariate analysis would have allowed him to put more than one explanatory variable into the equation at one time, but that he had not done a multivariate analysis. Tr. Trans. at

473. He testified that a multivariate analysis is necessary in order to separate out the impact of partisanship and racial demographics, but that although he did not explain the bivariate relationship between party and outcome, "you can get from the examination of the election results itself some sense of the party outcomes." Tr. Trans. at 474. However, Weber responded in the affirmative when asked, "There is literally no way to separate out voters who voted for a particular candidate because of race or because of party; correct?" He also answered "yes" to this question: "And, in fact, the test that you're using to make your conclusions regarding partisanship is what we just spoke about a moment ago, the interocular test? You're eyeballing the election results and making conclusions about partisanship; isn't that right?" Tr. Trans. at 474-475.

Weber suggested that a look at the election results gives "some sense of the party outcomes." Tr. Trans. at 474. Indeed, it is apparent that Republicans ordinarily win County Commission elections. Whether that means that Indians lose because they are Indians, or Indians lose because they are Democrats is not entirely clear. Lay witnesses from both sides testified that in their experiences, voters choose the "best" candidate, regardless of party affiliation. Rep. Patrick Goggles testified that "my experience has been in this county, most people vote the person rather than the party." Patrick Goggle Depo., at 101. Former Commissioner Lanny Applegate agreed that party affiliation is not determinative: "People tell me that they would more often vote for the person, the individual, rather than the party." Lanny Applegate Depo., at 34. Scott Ratliff, Commissioner Hickerson, and Commissioner Thompson all testified similarly. Tr. Trans. at 699, 1632, 1409. In addition, it is clear from a look at past electoral successes that Democrats have enjoyed some success in County

Commission elections. Democrats were elected in 1986 (Urbigkeit and Hudson), 1988 (Urbigkeit),

1992 (Phifer and Urbigkeit), 1994 (Nicol), and 2006 (Whiteman). Pls. Exs. 239 and 240. To review,

eight Indians have run for seats on the County Commission. Only one Indian, Keja Whiteman, was

victorious in her run for County Commission.

That only one Indian candidate has ever been elected to the County Commission is indeed

significant, and is a fact that cannot be ignored or completely explained away. Suggestions and

evidence that partisanship and ineffective campaigning were the reason for near-consistent Indian

electoral defeat are certainly evidence that this Court considers, but this evidence is not alone

dispositive. Rather, as the Tenth Circuit Court of Appeals instructed in *Sanchez*, the questions of

*why* voters voted as they did is part of "the searching evaluation done in the totality of the

circumstances." *Sanchez*, 97 F.3d at 1313. That searching evaluation requires the Court to weigh

all the factors and all of the relevant evidence. In short, the Court finds that the defense has not made

a showing that partisan politics were to blame for the lack of success amongst minority candidates.

The Court must also consider the testimony that shed some light on why voters may have

voted as they did. The County has suggested that unsuccessful American Indian candidates lost for

reasons other than bias in the electorate, including that they ran ineffective campaigns, failed to

address issues of interest to a countywide audience, and ran against popular incumbents. For

example, James Large testified that he did not do much campaigning. He stated that he did not

attend any forums, did not speak to anyone outside of the reservation, did not have radio or

newspaper ads, did not campaign at any public events, did not have yard signs, and spent, at most,

a week campaigning.  He did, however, put up fliers.  He agreed that the winners would "probably

not" have won if they campaigned like he did.  Tr. Trans. at 1070-72.  Gary Collins also testified

about his campaign strategy.  Mr. Collins spent approximately $100 on his campaign, and did not

seek or get contributions from anyone.  He handed out business cards, took out one newspaper ad

in the Riverton Ranger, and had no radio ads.  He did not go door to door, and attended only one

forum.  He ran against Ralph Urbigkeit, who was a well-known rancher in the area, both on and off

the reservation.  Tr. Trans. at 630-32.

Emma McAdams also testified about her campaigns.  Ms. McAdams ran twice, and although

she did not recall at her deposition that she ran the first time, the second time she actively

campaigned, handing out matchbooks and magnetic signs for vehicles.  She also took out newspaper

and radio ads.  She attended rallies, powwows, and parades.  She estimates that she spent $3000 on

her campaign in total.  She felt confident about her chances of winning, but was told by other tribal

members that "nobody from out here is going to get elected because they won't vote for people from

the reservation."  Tr. Trans. at 1006-1007.  McAdams finished first of four candidates for the

Democratic nomination, but finished last in the general election.  Significantly, she finished ahead

of Mr. Reno, a former Commissioner, in the primary, but finished behind him in the general election.

In the Court's view, this particular statistic weakens the defense argument that politics in Fremont

County are insulated from considerations of race.  She also testified that it is expensive to campaign

countywide in Fremont County, because a candidate has to travel long distances to get to the

different towns.  She also opined that at-large elections deter tribal members from becoming

candidates for the County Commission, because "the cost is probably a big deterrent." Tr. Trans. at 1008.

Scott Ratliff, a six-term State Representative, ran for the County Commission in 2000 and lost. He finished first in the Democratic primary and third in the general election. The defendants suggest that Ratliff was "wrong on the issues." Commissioner Thompson testified that the primary issue in the 1996 election concerned federal restrictions on public land use and fiscal responsibility and accountability. Tr. Trans. at 1350-1353. Commissioner Thompson testified that at forums, Mr. Ratliff's positions were based more on government funding and programming, and that he did not aggressively put forth an agenda to bring the county into the public lands process. Tr. Trans. at 1352. The Court also notes that Commissioner Thompson testified that Ralph Urbigkeit's position on the issues were similar to Thompson's. Tr. Trans. at 1352-1353. This would mean, apparently, that Mr. Urbigkeit was right on the issues, yet Urbigkeit finished last in the general election. While there are any number of reasons why Mr. Ratliff may have beaten Mr. Urbigkeit, this particular statistic weakens the defense theory of the weight that voters gave to the issues in that election.

The defense suggests that some of these candidates also lost their elections because they focused their platform on representing the reservation and Native interests. Instead of finding, as defendants urge, that this is a justification for their lack of success in the elections, the Court finds that this fact militates the other way. The Court recognizes the theory that at-large elections force candidates to represent the interests of the County residents as a whole, but to say that Indian candidates lost because they indicated a focus on Indian interests seems to support the plaintiffs',

88

rather than the defendants', argument.  Indeed, the fact that these Indian candidates are interested in representing the Indian population in Fremont County would appear to be a reasonable justification to campaign for office and to serve in a County that possesses a significant political and cultural force represented by the Wind River Indian Reservation. The Court finds it wholly appropriate that a candidate would represent an insular group on a board whose mission is to serve the County's residents as a whole.

### Whether There is a Significant Lack of Responsiveness on the Part of Elected Officials to the Particularized Needs of the Members of the Minority Group

There is some debate over the evidence that pertains to this factor, although some of the evidence presented makes it quite clear that there is a lack of responsiveness on the part of elected officials to the particularized needs of Tribal members. Based on the statistics demonstrating disparities between education level, home ownership, and income level of white residents of Fremont County versus Tribal members, it is abundantly clear that the Tribal members have particularized needs. "Unresponsiveness is not an essential part of plaintiff's case. Therefore, defendants' proof of some responsiveness would not negate plaintiff's showing by other, more objective factors . . . that minority voters nevertheless were shut out of equal access to the political process. . . However, should plaintiff choose to offer evidence of unresponsiveness, then the defendant could offer rebuttal evidence of its responsiveness." 1982 U.S.C.C.A.N. at 207 n. 116.

The most telling of this evidence came from the testimony of some of the former County Commissioners, who appeared to be largely unaware of the extent of poverty on the Reservation.

Gary Jennings, a former member of the State House of Representatives and a former member of the Fremont County Commission, testified in his deposition that Indians do not suffer any continuing effects of the past discrimination in their present-day incomes or education and that he did not know whether Indians suffered from past discrimination insofar as their ability to own their own homes. His testimony also revealed that he was largely unaware of the Native boarding school experience, and he testified that he was not aware of any discrimination against Indians by the United States or by the State of Wyoming. Similarly, Lanny Applegate, a former member of the County Commission, testified that he did not know if Indians in Fremont County were ever refused service in restaurants, and was unaware whether any establishments posted signs barring entry by Indian customers. He also testified that he was not aware that Indians on the reservation today suffer in any way from the effects of past discrimination, and that he had no knowledge of income levels, home ownership, car ownership, or life expectancy levels on the Reservation.

While there did appear to be a general lack of awareness as to conditions on the Reservation, there was also evidence of effort put forth by some County Commissioners to better understand some issues, especially as they pertained to jurisdiction over the roads on the Reservation. For example, Commissioner Thompson testified that he attended a two-day tribal relations conference in Thermopolis, a regional tribal meeting in Riverton, and a two-day workshop on federal Indian law and policy. Tr. Trans. at 1366. It appears that the road maintenance issue, at least, is improving, and that the County Commission has made an effort to work with the Tribe on that issue. Indeed, Commissioner Thompson testified that the Commission had attempted on several occasions to meet

with the Tribal Business Council, but that the Business Council could not get a quorum so it could not meet. Tr. Trans. at 1378. On several occasions the Commissioners tried to meet with the Business Council, and on several occasions the Tribe tried to send a representative to the County Commission to discuss road issues. None of these meetings proved fruitful. Commissioner Thompson also testified to a time when the Commission had arranged a lunch meeting with the Business Council, but the Business Council never came. Tr. Trans. at 1380-1381. The two entities eventually met and at this point appear to be making some progress on cooperating on the road maintenance and jurisdiction issue. Tr. Trans. at 1382-1390.

While progress has been made and some Commissioners have made an effort to understand the complex legal web of federal Indian law, the evidence revealed a disconnect between the County Commission and the Tribes that calls into question the ability of the County Commission to respond to the needs of the Tribal members, and indeed, the desire to do so. Commissioner Hickerson testified that none of the social programs that the Commission supports has an office or physical plant on the Reservation, and that the Commission has never undertaken any specific projects on the Reservation. Tr. Trans. at 1525, 1637. Commissioner Whiteman testified that she feels that she has a special obligation to the Reservation's residents because, as she explained, they are "a group of constituents that I don't feel were well represented on the County Commission." Tr. Trans. at 1547. One of the reasons she decided to run for the County Commission was because she did not see an effort by the Commission to cooperate with the Reservation. Tr. Trans. at 1544. Further, while the Court will not make much of the County employment statistics that evidence a lack of Indians

91

employed by the County, the Court did recognize that the testimony revealed that the County Commissioners were largely uninterested in the issue and the statistics and appeared not to have noticed the lack of Indian employees. While the Commissioners testified that the hiring had been conducted on a racially-neutral policy, the statistics and the evidence brought doubt that the policy was, in actuality, race-neutral.

### Whether the Policy Underlying the State or Political Subdivision's Use of Such Voting Qualification, Prerequisite to Voting, or Standard, Practice or Procedure is Tenuous

Wyoming Statute § 18-3-501(a) provides for the at-large system in County Commission elections. The statute also authorizes single member districts upon submission of a proposition for districting and upon subsequent majority approval by the electorate. *See* Wyo. Stat. Ann. § 18-3-501(g). Both parties to this suit pointed to the benefits and detriments of the at-large system and the single member district system. Witnesses for both sides explained the grounds for their perception that one particular system was preferable to the other.

Plaintiffs submit that the at-large system for the County Commission elections is tenuous, and point out that districts are the norm in elections in Fremont County and for the state legislature. While the Court agrees that the at-large system is not the norm in elections in Fremont County or for the State legislature, it notes that the at-large system is standard for County Commission elections in the State, having been adopted for County Commission elections state-wide since at least 1899. *See* Wyo. Rev. Stat. § 10-7-1056 (1899). In combination with the fact that the at-large system carries with it its own set of benefits, it cannot be said that the policy underlying the system is tenuous. In

its limited analysis of this particular factor, the Court is not making a judgment call regarding which system is preferable. It need only say that the policy underlying the at-large system is not tenuous.

## **Exogenous Elections**

As discussed above, the Court finds that it is not necessary to consider the at-large elections for the State House of Representatives in its determination regarding racial bloc voting. This was based on the fact that both experts agreed that there was enough data in the form of endogenous elections on which the Court could base its conclusion. Because there are slight differences with regard to the at-large voting systems for the State House of Representatives and the County Commission elections, in that the elections for the State House of Representatives allows more opportunity for single-shot voting, the Court found that it was not appropriate—in part because it was not necessary—to consider those elections in that portion of its analysis. The at-large elections for the State House of Representatives are nevertheless relevant. As the Court explained in *Gingles*, the list of Senate factors is "neither comprehensive nor exclusive," and that "other factors may also be relevant and may be considered." *Gingles*, 478 U.S. at 45. This Court therefore finds it appropriate, especially in light of its mandate to conduct "a searching practical evaluation of the 'past and present reality,'" *Gingles*, 478 U.S. at 45 (citing U.S. Code Cong. & Admin. News 1982, p. 208), to consider the exogenous elections for whatever light they can shed.

The exogenous elections here are the at-large elections for the State House of Representatives, which was the electoral system until it changed to a single-member district system.

93

Weber analyzed those elections from 1982-1990. Ex. B at 59. Each contest had one Native American candidate competing during the time period under consideration. Ex. B at 53. As explained above, the system for the State House elections is slightly different than that for the County Commission elections in that it provides a greater opportunity for single-shot voting. Tr. Trans. at 494. In sum, Weber found that in all five of the elections where the candidate was cohesively preferred by the Native community between 1982 and 1990, the cohesively preferred candidate was elected, which lead to a zero defeat rate in those elections. Tr. Trans. at 428. When Weber considered those elections in combination with the County Commission at-large elections, he concluded that vote dilution was not occurring, because he calculated that there was a total of ten defeats and fourteen wins for cohesively preferred Native American candidates. Tr. Trans. at 428-429. The Court does not use those elections and reach the same conclusion, because, as already explained, they are different from the County Commission elections, which are the elections being challenged here. Consideration of this success rate in at-large elections for the State House is nevertheless another factor to consider in the totality of the circumstances analysis.

With regard to the State House of Representatives elections for after 1992, when the electoral system was converted to single-member districts, the defendants also proffered explanations for American Indian defeat in those races. The defense noted that in those races, the Native candidates were often running against popular incumbents or popular local figures, such as Dr. Harry Tipton, a Lander physician. (Defendants' Proposed Findings of Facts pp. 120-22).

94

The Court agrees with plaintiffs that the defenses asserted by defendants are not cognizable under Section 2. White opposition to district elections is not a defense to a Section 2 claim. There is no basis in fact for the defendants' contention that adoption of district elections for the County Commission would set back race relations in Fremont County. There is no doubt that certain individuals did express opposition to district elections, including those who had been elected under the previous system. However, given the existence of district elections at every level of government in the county and state, including municipalities, school boards, fire districts, irrigation districts and the state legislature, the argument that district elections exacerbate racial discord and conflict is without merit and unsupported in the record. Mayor John Vincent, from Riverton, stated that the districting system for the state legislature, which has been opposed by some whites, has improved Indian/white relations rather than setting race relations back. To support his claim, Mayor Vincent cites the recent creation of a Select Tribal Relations Committee and tribal liaison positions. Tr. Trans. at 1766-1767 (John Vincent). Mayor Vincent also testified that he believed relations between Indians and non-Indians in Riverton and in the county were "a lot better." Tr. Trans. at 1758.

White opposition to equal voting rights for Indians, including the adoption of effective remedies for vote dilution, cannot trump the Voting Rights Act. In Buchanan v. Warley, 245 U.S. 60, 81 (1917), in which the Supreme Court invalidated a municipal ordinance requiring racial segregation of neighborhoods, the Court articulated the principle that preservation of the public peace "cannot be accomplished by laws or ordinances which deny rights created or protected by the federal Constitution." This is a principle consistently applied by courts.

In *Cooper v. Aaron*, 358 U.S. 1, 15 (1958), school officials in Little Rock, Arkansas, asked the federal court to postpone desegregation of Central High School because of "extreme public hostility," and because "the maintenance of a sound educational program . . . with the Negro students in attendance, would be impossible." In denying the request, the Court held that "law and order are not here to be preserved by depriving the Negro children of their constitutional rights." *Id.* at 16. In a concurring opinion, Justice Frankfurter wrote that "resistence to law cannot be made a legal reason for its suspension without loosening the fabric of our society." *Id.* at 22. *Accord, Watson v. Memphis,* 373 U.S. 526, 535 (1963) ("constitutional rights may not be denied simply because of hostility to their assertion or exercise." The Court relied on *Cooper v. Aaron* and the primacy of federal law in concluding that the one person, one vote concept applied to redistricting at the county level. *Avery v. Midland County, Texas*, 390 U.S. 494, 479-480 (1968). The Court finds there is no basis for Fremont County to avoid compliance with the Voting Rights Act based on opposition of members of the white community to equal voting rights for Indians.

Finally, in this regard and with respect to the defendants' suggested reasons for Native defeats in these elections, the Court finds the evidence is not probative. It is not necessary to explain why Natives were defeated in these particular elections; it is merely necessary to establish that Native candidates are normally defeated--the result, not the intent. "If the third *Gingles*' precondition asks whether whites vote sufficiently as a bloc to enable them usually to defeat the minority candidate, it is asking *how* voters vote, not *why* voters voted that way. Indeed, the searching evaluation done in the totality of circumstances perhaps reveals the answer to the latter question. However, at the

threshold, we are simply looking for proof of the correlation between the race of the voter and the defeat of the minority's preferred candidate." *Sanchez*, 97 F.3d at 1313. Further, it is helpful to note that the evidence and proffered defense explanations are not entirely convincing, because prior to 2002, House District 33 was not majority Indian. It was redistricted in 2002 to become majority Indian. There simply are too many variables between all of these elections to make them especially probative in this case.

The defense has also asserted that because the WRIR is home to two Indian tribes, they cannot prove a Section 2 claim in this case. The courts in *United States v. Blaine County, Montana,* 363 F.3d 897 (9th Cir. 2004) (Fort Belknap Reservation in Blaine County, Montana home to two tribes, Gros Ventre and Assiniboine); *Windy Boy v. Big Horn County,* 647 F. Supp. 1002, 1004 (D. Mont. 1986) (Crow and Northern Cheyenne tribes living on tribal reservations in Big Horn County, Montana); *Stabler v. County of Thurston*, 129 F.3d 1015, 1018 (8th cir. 1997) (separate reservations for two tribes, Omaha and Winnebago, in eastern Thurston County, Nebraska) all found Section 2 violations and that the tribes were politically cohesive for purposes of Section 2. In addition, in this case, there was extensive evidence of commonality and cohesiveness between the Eastern Shoshone and Northern Arapaho tribes on the WRIR. The defendants' assertions in this regard are without merit.

The defendants have also argued that Indians simply do not care to participate in county and state elections and if there is any dilution of Indian voting strength, it is the result of Indian apathy. This argument overlooks the fact that Indians were historically denied the right to vote, that literacy

tests had been imposed, and that Indians had suffered other forms of discrimination in the past, all of which have been responsible for denying Indians the opportunity to participate in the political process. In *Bone Shirt v. Hazeltine*, 336 F. Supp.2d 976, 1022 (D. S.D. 2004), the court stated, "the long history of discrimination against Indians has wrongfully denied Indians an equal opportunity to get involved in the political process."

Additionally, the evidence presented during trial disclosed that Indians do care about county and state politics. Indians have been candidates in many county and state elections, as noted at length in this opinion, and have received strong support from Indian voters. If they did not care about state and local politics, this simply would not have occurred. It is likely that more Indians might have run for office if they perceived the system to be fair and provided any realistic chance of being elected. The lack of minority candidates "is a likely result of a racially discriminatory system." *McMillan v. Escambia County*, 748 F.2d 1037, 1045 (11th Cir. 1984). The court in *Hendrix v. McKinney*, 460 F. Supp. 626, 632 (M.D. Ala. 1978), indicated that white bloc voting "undoubtedly discourages [minority] candidates because they face the certain prospect of defeat." In *Little Thunder v. State of South Dakota*, 518 F.2d 1253 (8th Cir. 1975), the court stated, citing *Evans v. Cornman,* 398 U.S. 419, 423, 90 S.Ct. 1751, 1755 (1970), that a court should approach the claim that certain persons lack a substantial interest in the electoral process with skepticism for "(a)ll too often, lack of a 'substantial interest' might mean no more than a different interest, and "'(f)encing out' from the franchise a sector of the population because of the way they may vote is constitutionally impermissible.'" *See also, e.g., Cuthair v. Montezuma-Cortez, Colorado School*

98

*District*, 7 F. Supp. 2d at 1161; *United States v. Blaine County, Montana*, 363 F.3d at 911; *Windy Boy v. County of Big Horn*, 647 F. Supp. at 1021. The Court rejects any argument that voter apathy explains any dilution of Indian voting strength in this case.

## Experts

The defense tendered objections to the testimony of Dr. Hipp and Dr. Massey. Specifically, the defense contended that Dr. Hipp is not an expert on the subjects to which she testified, and that Dr. Massey is not qualified as an expert to testify concerning the effect of socioeconomic disparities on voting in Fremont County.

The Court recognizes and finds that Dr. Hipp undertook the invaluable project of conducting interviews and gathering first hand information from tribal members in order to gain an understanding of the Native experience in Fremont County in the past and present. While the Court recognizes that Dr. Stephan Thernstrom, who was employed by the defense to critique Dr. Hipp's report, may be an expert on research methodology, the Court wholly rejects the opinions he proffered on the historic and present day experience of Native people and race relations in Fremont County, as it was apparent that Dr. Thernstrom was not only treading far outside of his narrow role in this litigation, but was also testifying about matters in which he had little experience or knowledge. His testimony was of limited value in assessing the issues arising in this case.

Dr. Massey's survey was thorough and sufficient to justify this Court's reliance. With the wealth of information that was presented to this Court during the two weeks of bench trial, it is

neither necessary nor possible to memorialize all the testimony from all of the experts in this Order. As reflected in its Memorandum Order, the Court has utilized their submissions as factual background as necessary, but has not relied heavily on their conclusions.

## Judgment

Plaintiffs have carried their burden of proving compactness, cohesion and white bloc voting and have also satisfied the totality of the circumstances test. The Court finds and concludes that the plaintiffs have shown that at-large elections for the Fremont County Commission dilute Indian voting strength in violation of Section 2 of the Voting Rights Act. Accordingly, there is no need or reason to address plaintiffs' claim that such elections also violate the United States Constitution.

In their complaint, plaintiffs asked the Court to (1) enter declaratory judgment of a Section 2 violation, (2) enter permanent injunction against further use of the at-large system, (3) enjoin defendants from failing to conduct elections for the County Commission in a timely fashion pursuant to a redistricting plan that complies with Section 2 of the Voting Rights Act, (4) in the event that defendants fail or are unable to conduct elections in a timely fashion pursuant to redistricting plan that complies with Section 2, implement a court ordered redistricting plan and scheduling of elections.

The issue as to appropriate remedies was not addressed in the initial trial of this matter. In *Windy Boy v. Big Horn County*, 647 F. Supp. at 1023, the district court stated:

"A district judge adopting districting plans to replace an invalidated at-large system must adhere to the middle of the road." *Jones v. City of Lubbock*, 727 F.2d

364, 386 (5th Cir.1984). It must be remembered that "[a]pportionment is principally a legislative responsibility [and] a district court should ... afford to the governmental body a reasonable opportunity to produce a [statutorily] permissible plan." *Id.* at 387.

Defendants are hereby ordered to propose a remedy to this court, consistent with the caselaw, that requires the election of some or all Commissioners and school board members by district. The court believes a new system can be put in place for the 1986 elections (1987 for school board) and would instruct defendants to propose a timetable for implementation with that in mind. Defendants shall submit a proposal by June 30, 1986. If need be, interim remedies, alternative remedies, or revised election schedules may be proposed. The court will schedule a hearing soon thereafter to ensure the proposed voting system complies with Section 2. *Edge v. Sumter Co. School Dist.*, 775 F.2d 1509, 1510-11 (11th Cir.1985) (a hearing must be held). Plaintiffs will, of course, be given an opportunity to comment on the proposal. The court believes time is of the essence and seeks to have a remedy in place as soon as possible.

This Court agrees that the approach adopted by the court in *Windy Boy v. Big Horn County*

is a reasonable and fair approach, particularly given the concern that the court interferes with the

legislative process when it crafts a remedy without allowing the governing body to first design an

electoral process designed to eliminate barriers to full Indian participation in the electoral process.

Thus, the Court finds that the governmental body must be given a reasonable opportunity to produce

a permissible voting plan in this case.

To that ends, the defendants are hereby ordered to propose a remedy to this Court, consistent

with this opinion and applicable caselaw, that requires the election of county commissioners in

Fremont County by district rather than at-large. It is quite probable that a new system could be put

in place for the next election cycle. The Court orders the defendants to propose a timetable for

implementation with that in mind as well. Defendants shall submit a proposal by June 30, 2010;

plaintiffs shall have until July 30, 2010 to respond and offer comments on defendants' proposal. A

hearing shall be held August 13, 2010 at 1:30 p.m. in Cheyenne, Wyoming, to ensure that the

proposed voting system complies with Section 2. It is further ordered that defendants are

permanently enjoined from utilizing the existing at-large voting system in the future.

Dated this _29_ day of _April_ _____ 2010.

ALAN B. JOHNSON
UNITED STATES DISTRICT JUDGE

102